**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Adams,* Slip Opinion No. 2015-Ohio-3954.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2015-OHIO-3954

THE STATE OF OHIO, APPELLEE, *v.* ADAMS, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Adams,* Slip Opinion No. 2015-Ohio-3954.]

*Criminal Law—Aggravated murder—R.C. 2929.05(A)—Independent review of sufficiency of the evidence supporting R.C. 2929.04(A)(7) capital specification—Multiple predicate offenses—Lack of proof as to one of the alternative means to establish aggravating circumstance—Death penalty vacated and resentencing ordered.*

(No. 2011-1978—Submitted March 11, 2014—Decided October 1, 2015.)

APPEAL from the Court of Appeals for Mahoning County,

No. 08 MA 246, 2011-Ohio-5361.

————————————

**SYLLABUS OF THE COURT**

1. The predicate offenses listed in the R.C. 2929.04(A)(7) capital specification are "alternative means" of establishing that an offense of aggravated murder meets the criteria for imposing a death sentence.

2. To find that the R.C. 2929.04(A)(7) specification has been proved when more than one predicate offense is alleged, the jury must unanimously find beyond a reasonable doubt that the defendant committed aggravated murder during the course of one or more of the alleged predicate offenses, but the jury need not unanimously agree on which predicate offense was committed.

3. In an appeal of a death sentence based on an R.C. 2929.04(A)(7) specification when more than one predicate offense is alleged but the jury has not made a finding as to which predicate offense was committed, a reviewing court must determine under R.C. 2929.05(A) whether there is sufficient evidence to support each of the alternative predicate-offense theories. The appellate court must determine whether a rational trier of fact could have found each means of committing the crime of aggravated murder in the course of the alleged R.C. 2929.04(A)(7) predicate offenses proved beyond a reasonable doubt.

4. When an appellate court reviews the sufficiency of the evidence pursuant to R.C. 2929.05(A) as to the R.C. 2929.04(A)(7) aggravating circumstance in an aggravated-murder case in which more than one predicate offense is alleged but the jury has not made a finding as to which predicate offense was committed and determines that the state proved some but not all of the alleged alternative means that could establish the aggravating circumstance, the evidence is, as a matter of law, insufficient to support a death sentence and the death sentence must be vacated.

5. When an appellate court reviews the sufficiency of the evidence to support a capital specification and determines that the evidence is, as a matter of law, insufficient to support a death sentence and vacates the death sentence, the state is barred by the Double Jeopardy Clause of the United States Constitution from seeking the death penalty on remand.

**O'CONNOR, C.J.**

{¶ 1} This is an appeal as of right from a judgment affirming an aggravated-murder conviction and death sentence. A Mahoning County jury convicted appellant, Bennie Adams, of aggravated murder in connection with the rape and murder of Gina Tenney and unanimously recommended a sentence of death. The trial court accepted the recommendation and sentenced Adams accordingly. The Seventh District Court of Appeals affirmed the conviction and sentence.

{¶ 2} Although we affirm the conviction for aggravated murder, we vacate the sentence of death and remand the matter for resentencing in accordance with this opinion.

### RELEVANT BACKGROUND

*The Evidence at Trial*

{¶ 3} The state called 18 witnesses to testify at trial. The defense presented no witnesses of its own but did recall and briefly question one of the state's witnesses. The evidence that follows was presented to the jury.

### *The burglary and the murder*

{¶ 4} In the autumn of 1985, Gina Tenney was a sophomore at Youngstown State University. She lived alone in a second-floor apartment in a converted house on Ohio Avenue in Youngstown.

{¶ 5} Adams lived in the same house in a downstairs apartment with his girlfriend, Adena Fedelia. The duplex had an interior common staircase.

{¶ 6} Around 1:00 a.m. on December 25, 1985, Tenney was getting ready for bed when, as she told a friend, she "heard someone at the door with the keys like they were trying to get in." Tenney called her ex-boyfriend, Mark Passarello, who came and stayed with her until about 3:00 a.m. on Christmas morning.

{¶ 7} Shortly after Passarello left, Tenney again heard someone at her door. The person knocked over the chair Tenney had placed against the door and

entered the apartment. Tenney called the police to report an intruder in her apartment. The responding police officers found footprints in the snow leading from her apartment to 275 West Dennick Avenue in Youngstown.

{¶ 8} The investigation was assigned to Detective William Blanchard of the Youngstown Police Department. On December 26, 1985, Blanchard met with Tenney at her apartment. Looking at her apartment door, Blanchard saw "slight" but "noticeable" evidence of a forced entry.

{¶ 9} Blanchard followed up on the report of footprints by traveling to 275 West Dennick and interviewing a resident there, Ed Tragesser. Tragesser claimed to know nothing about the break-in. Blanchard testified that Tragesser was never ruled out as the burglar but that there was no evidence to sustain charging him with any crime. Blanchard, however, suspected that Adams may have been the burglar based on what Tenney had told him.

{¶ 10} Tenney's friend, Penny Sergeff, also suspected that Adams was the burglar.

{¶ 11} According to Sergeff, the outside door to Tenney's building made a loud screeching noise when it was opened or closed. But Tenney had not heard the door screech the night of the burglary, which suggested to Sergeff that the burglar had not come from outside the apartment building. Sergeff shared the information about the screeching door with the police, but never explicitly communicated her suspicions about Adams at the time she initially spoke to the police.

{¶ 12} Less than a week after the break-in, on the morning of December 30, 1985, Tenney's dead body was discovered in the Mahoning River. Upon identifying Tenney's body, homicide detectives called Blanchard into the investigation.

### *The investigation and arrest of Adams*

{¶ 13} From the outset, Blanchard considered Adams a person of interest in the homicide.

{¶ 14} Blanchard and two homicide detectives traveled to the duplex on Ohio Avenue. They knocked on the exterior door for "a number of minutes" until Adams emerged from his apartment and admitted them into the common area.

{¶ 15} Upstairs, the police officers found the door to Tenney's apartment locked. They observed no blood on the steps. Blanchard saw no new evidence of forced entry.

{¶ 16} The investigators decided to call the building's owner for the key to Tenney's apartment. They then knocked on Adams's apartment door for permission to use his telephone; Adams let them in.

{¶ 17} While one detective placed the call, Blanchard and Lieutenant David Campana talked to Adams, asking him when he had last seen Tenney, whether anything suspicious had been happening lately, whether anybody else was around who might know something, and whether he was alone. Adams indicated that he was alone in the apartment and told detectives that he did not know where Tenney might be.

{¶ 18} Just then, the detectives heard a loud bump, a sound like a door hitting a wall. Adams then said, "I never said he wasn't here" or words to that effect. Blanchard and Campana went into a back bedroom, where they found Horace Landers hiding behind a door.

{¶ 19} Campana recognized Landers and remembered that there was an outstanding misdemeanor warrant for him. Campana and Blanchard immediately arrested Landers and handcuffed him.

{¶ 20} Landers was wearing trousers, but was bare-chested. Knowing that they would have to take him outside into the cold, Blanchard looked around and saw a shirt on the bed, which he draped over Landers's shoulders. But Blanchard

thought that he should put something else on Landers. He saw a jacket on the floor three or four feet away, just outside the door to the bedroom where they had found Landers.

{¶ 21} As Blanchard searched the jacket for weapons, Landers told him that the jacket belonged to Adams. Simultaneously, Blanchard felt a hard object in the pocket and pulled it out. The object was an ATM card from Dollar Bank bearing the name Gina Tenney. Blanchard testified that he also found a folded Mahoning County welfare card in the name of Bennie Adams in the pocket.

{¶ 22} The police officers immediately arrested Adams. When they searched him, they found a blue tissue in his pants pocket with two cigarette butts wrapped up in it.

{¶ 23} Fedelia, whose name was on the lease, consented to a search of the apartment she shared with Adams. In a bathroom wastepaper basket, police officers found a ring of ten keys with the letter G on the keychain. One of the keys fit Tenney's apartment door and another key fit her automobile.

{¶ 24} In the kitchen, Blanchard found a potholder with hair and dirt on it in a wastebasket. Police officers later found a matching potholder atop the refrigerator in Tenney's apartment.

{¶ 25} Police officers also found an unplugged television on a bed in Adams's apartment. The serial number on the television matched the number on an empty television box later discovered in Tenney's apartment. A wall unit in Tenney's apartment contained an empty space for a television, and a cable-television line dangled in the space.

{¶ 26} In Tenney's apartment, Blanchard saw no broken glass, broken furniture, or other indication that the home had been ransacked. A plate of food and a beer bottle were on the kitchen table. At trial, Blanchard claimed a "vague recollection" of "some disarray," but could not recall what he had observed. His

contemporaneous investigative notes did not mention disarray or overturned furniture.

{¶ 27} Tenney's friends told police investigators that Adams had been bothering Tenney for some time before her death. Sergeff and Marvin Robinson, another one of Tenney's friends, testified that when they visited Tenney, Adams often stood in his doorway watching them or peeked out through the curtains. According to Robinson and Sergeff, Adams started calling Tenney late at night, asking her to invite him up to her apartment. The calls continued even after Tenney asked him to stop, and Tenney eventually changed her telephone number.

{¶ 28} Robinson also described an incident in which someone slipped a card in an envelope under Tenney's back door addressed "to a very sweet and confused young lady" and signed "love, Bennie." Police officers found the envelope in Tenney's apartment but did not find the card.

{¶ 29} According to her friends, after the Christmas break-in Tenney's emotional state changed from frustration with Adams to fear of him. For the next few nights, she asked a friend to stay over because she was afraid to be alone. Sergeff testified that Tenney specifically had said that she was afraid of Adams, a detail Sergeff did not include in her police statement given shortly after Tenney's death.

{¶ 30} At trial, Tenney's friends described their interactions with her during the last two days of her life. Sergeff and Tenney spent the evening of December 28, 1985, watching television in Tenney's apartment. At some point, Passarello, Tenney's ex-boyfriend, came over, and Sergeff asked him to drive her home. Passarello then returned to Tenney's apartment. Passarello testified that Tenney did not feel secure in the apartment. He stayed the night, and the two had sexual relations.

{¶ 31} Passarello left the next day after lunch and went home to his apartment. Tenney left separately at the same time to meet a friend, Jeff Thomas, for an early afternoon movie.

{¶ 32} After the movie, Thomas and Tenney had dinner near the theater. Thomas testified that they talked about work and school, but Tenney kept bringing the conversation back to "the situation that was going on where she was living." She told Thomas that she was very concerned about "the man downstairs." Thomas described her as "apprehensive" and "borderline fearful." Thomas and Tenney parted around 4:30 or 5:00 p.m.

{¶ 33} Tenney's mother, Avalon Tenney, testified that her daughter had called her the day before she died and told her that she was afraid of Adams.

### *The identification of Adams*

{¶ 34} As part of the homicide investigation, detectives obtained Tenney's bank-account records from Dollar Bank. Her account records for December 29, 1985, showed six attempted transactions on her ATM card between 9:24 and 9:34 p.m.: three attempts to withdraw cash (all denied for insufficient funds), two phony attempted deposits using empty deposit envelopes, and an unsuccessful attempt to transfer funds between accounts.

{¶ 35} Police officers questioned other bank customers whose ATM cards were used at the same ATM machine around the same time as the attempted transactions using Tenney's card. One customer, John Allie, told police officers that he saw a man at the ATM on the night in question.

{¶ 36} On January 8, 1986, Blanchard brought John Allie and his wife, Sandra Allie, who had also seen the man use the ATM, to the station to view an in-person lineup. There were six men in the lineup, including Adams and Landers. John Allie did not make an identification; Sandra Allie identified Landers as the man she saw at the ATM.

{¶ 37} At trial, John Allie testified that he had not identified anyone in the lineup because he was not comfortable with the number of people in the room. He also testified, "I told my wife, don't say anything because we need to talk to detective Blanchard. Don't mention nothing to nobody."

{¶ 38} John Allie told the jury that he later telephoned Blanchard and said that the man from the ATM was third from the left, which was the place where Adams had stood in the lineup. John claimed that he returned to the police station the next day, met with Blanchard, viewed a photo array of three pictures, and made an identification of Adams.[1]

{¶ 39} Sandra Allie testified at trial that she purposely made a false identification at the lineup. She testified that on the way to the station that day, John had expressed concern about putting her "in harm's way." When they arrived, they were taken to an office with other people present and not to the dark room that Sandra had been expecting. John then told her that "he didn't like the surroundings." "He gave me like the signal," Sandra testified. "When asked if I could identify the person who was in the ATM I was just terrified, went to the extreme opposite and identified a short, light-skinned person."

{¶ 40} Like her husband, Sandra Allie testified that she spoke to police officers some time after the lineup to identify "the actual person," but said that the police officers did not request a statement about her misidentification at the first lineup or call her back to view a second lineup.

{¶ 41} At trial, the Allies both said that when they arrived at the bank that night,[2] they saw a man in the ATM vestibule who appeared not to know how to

---

[1] Blanchard testified at trial that he never met in person with John Allie after the lineup and that John Allie never returned to view photographs.

[2] As previously noted, the bank's records indicated that Tenney's ATM card was used around 9:30 p.m., which in Youngstown in December would have been after nightfall. But John Allie insisted that the encounter at the ATM occurred while it was still light outside.

use the ATM. The man's face was covered by a hood and scarf, so that only his forehead, eyes, and the bridge of his nose were visible.

{¶ 42} Sandra Allie described the man as a little taller than she is. John Allie agreed that the man was "about medium height."[3]

{¶ 43} At trial, Sandra Allie viewed a photograph of the six-man lineup and testified that person Number 3 (Adams) was the man at the ATM. John Allie also identified Adams.

{¶ 44} John Allie testified that when the man came out of the ATM vestibule, he stood in front of the Allies' car and waved: "He put his hands— palms on the hood of my car and stood back, looked at me. I looked at him. He waved. I waved." John recognized Adams from seeing him around the neighborhood, even though he did not know Adams's name at the time.

{¶ 45} When the man started the car he was driving, John Allie heard it make an unusual sound. John testified that the vehicle was a Buick and identified it from photographs as Tenney's car. When John came to the police station, he correctly picked out Tenney's car from the 15 or 20 he was shown. An officer started the engine, and the car made the same sound that John had heard it make at the bank.

### *The parole officer's interviews with Adams*

{¶ 46} Adams's former parole officer, William Soccorsy, testified that he interviewed Adams twice after his 1985 arrest. The first time they spoke, on December 30, 1985, Adams denied committing any crime and denied having any knowledge that any crime had been committed.

{¶ 47} On January 2, 1986, Soccorsy asked Adams about the ATM card. According to Soccorsy, Adams admitted that the jacket in which the card was found belonged to him. Soccorsy's contemporaneous notes included a statement

---

[3] Sandra Allie is about five feet, five inches tall. Bennie Adams is six feet, two inches tall. Horace Landers was five feet, eight inches tall.

by Adams to the effect that he found the ATM card outside his building on the front step at around 11:30 a.m. on December 30, 1985. Adams told Soccorsy that he rang Tenney's doorbell to return the card but she was not home, so he put the card in his jacket pocket, intending to return it at some later time.

### *The autopsy of Tenney*

{¶ 48} On December 31, 1985, an autopsy of Tenney's body was performed under the supervision of Mahoning County Coroner Nathan D. Belinky, M.D.

{¶ 49} Dr. Belinky reported finding "ligature type contusion(s)" on the neck, as well as "doubletrack ligature type contusions" around both wrists. There were additional contusions and/or abrasions on both wrists, the abdomen and chest, both breasts, and around the nose, lips, and chin. There was blood coming from the right nostril. Dr. Belinky concluded that the cause of death was "traumatic asphyxiation," and he ruled the death a homicide.

{¶ 50} Dr. Belinky was deceased when the case first came to trial in 2008, and the state called Dr. Humphrey Germaniuk as its expert forensic pathologist.

{¶ 51} Dr. Germaniuk testified that he reviewed Dr. Belinky's autopsy report and the death certificate, as well as the videotape of the autopsy and photographs of the body and the scene. The photographs showed a bruise or contusion on the upper part of Tenney's right lip and abrasions or contusions on her chin, a faint ligature mark on Tenney's neck (which Dr. Germaniuk described as "superficial"), and ligature marks on her left and right wrists.

{¶ 52} Dr. Germaniuk ruled out drowning as a cause of death based on the absence of a "foam cone" around Tenney's mouth. He concluded that the cause of death was asphyxia and the manner of death was homicide. But Dr. Germaniuk took issue with the phrase "traumatic asphyxiation" in the autopsy report, which he characterized as "somewhat inexact, somewhat incorrect." He

would have described the cause of death as "asphyxia," which simply means lack of oxygen.

{¶ 53} Dr. Germaniuk observed a bruise or contusion on the upper part of Tenney's right lip and abrasions or contusions on her chin. Although Dr. Germaniuk testified that the marks were consistent with smothering by means of a hand or object placed over her face, he also testified that the marks could have been caused by someone hitting her in the face. Dr. Germaniuk said that the evidence of smothering was not significant enough for him to declare that the cause of death with any reasonable medical certainty.

{¶ 54} Likewise, Dr. Germaniuk testified that there was evidence of ligature strangulation, including petechial hemorrhaging, but the ligature marks did not break the skin. The injuries could have been caused by strangulation or by being tied up, but Dr. Germaniuk could not say that ligature strangulation caused Tenney's death. Dr. Germaniuk testified that the cause of death was "probably" some combination of smothering and/or ligature strangulation. Ultimately, Dr. Germaniuk was unable to opine as to a cause of death that was more specific than asphyxia.

{¶ 55} The autopsy report listed the time of death as 11:15 p.m., based on a test of Tenney's vitreous potassium. But according to Dr. Germaniuk, vitreous potassium is an inaccurate indicator of time of death and even in 1985, only the "uninformed" would have used vitreous potassium to determine time of death. Dr. Germaniuk explained that most other tests for time of death could not have been employed, because Tenney's body had been found in the frigid waters of the Mahoning River. And though the time of death could possibly have been determined based on gastric emptying, i.e., by measuring the contents of the stomach, in order to make a reasonable calculation one has to know the time of the victim's last meal. Assuming that Tenney last ate around 4:00 or 4:30 p.m. (when she and Thomas had dinner after the movie), Dr. Germaniuk estimated the

12

time of death as between 5:00 and 10:30 p.m. But if Tenney had eaten later, his estimate of her time of death would have been different.

{¶ 56} The prosecution in questioning Dr. Germaniuk noted several times that police officers had found a telephone type of cord in the trunk of Tenney's car. The cord was one-half centimeter wide and had no weaving pattern. The ligature marks were also one-half centimeter wide and showed no weave pattern. According to Dr. Germaniuk, the cord could have been used to make the ligature marks on Tenney's neck and wrists, but because the cord was not different from thousands of other cords, he was unable to definitively say that the cord in the trunk was used on Tenney.

{¶ 57} Dr. Germaniuk testified that the autopsy team did not examine the body for signs of sexual trauma or assault.

### DNA and fingerprint evidence

{¶ 58} When Adams was arrested in late 1985, police officers obtained samples of his pubic hair, saliva, and blood. Samples were also obtained from Landers, Passarello, and Tenney, and semen was found on a vaginal swab taken from Tenney. The samples from Adams, Landers, and Passarello were compared to the samples taken from Tenney.

{¶ 59} The semen on the swab came from a "type B nonsecretor." Passarello is a type A secretor, and Landers was a type B secretor. Thus, blood testing in 1986 eliminated Passarello and Landers as the semen source.

{¶ 60} Adams, however, is a type B nonsecretor. Four percent of African-Americans are type B nonsecretors. Thus, the blood evidence at that time did not definitively prove that Adams, an African-American, was the source of the vaginal semen, but it placed him within the population of possible sources.

{¶ 61} The potholder in Adams's apartment contained hair from an African-American and from a Caucasian with red hair, as well as pubic hair. Gina Tenney was Caucasian and had red hair. The red hair and pubic hair were

consistent with Tenney's. The sample of African-American hair was small fragments and was not sufficient for comparison purposes.

{¶ 62} Police officers found fingerprints of evidentiary value only on the television that was in Adams's apartment. Investigators were able to lift nine usable prints from the television. Four prints matched Adams's. The other five could not be matched to Tenney, Adams, or Landers.

{¶ 63} Despite the suspicions that Adams may have been involved in Tenney's death, the investigation into Tenney's death went cold in 1986. In January 1986, Adams was charged with one count of receiving stolen property based on the discovery of Tenney's ATM card in his jacket pocket. The grand jury, however, later declined to indict Adams on the stolen-property charge.

{¶ 64} Police officers kept Adams in custody because he was a suspect in a rape that had occurred in nearby Boardman, Ohio. In November 1986, Adams was convicted in Mahoning County Common Pleas Court of kidnapping, rape, and aggravated robbery in that case. He served almost 18 years in prison, and he was released on parole on April 21, 2004.

### The investigation resumes

{¶ 65} In 2007, more than 20 years after Tenney's death, the Ohio attorney general invited police departments to submit cold-case evidence to the Ohio Bureau of Criminal Identification and Investigation ("BCI") laboratory for DNA testing. The Youngstown police department submitted evidence from the Tenney case.

{¶ 66} The police department submitted Tenney's underwear and vaginal swab for DNA testing and submitted a fresh DNA sample from Passarello. Because Tenney and Landers were both deceased, the department forwarded

samples from 1986 that were still on file. Police officers also took a fresh DNA sample from Adams and submitted that to BCI.[4]

**{¶ 67}** Based on the DNA analysis, Adams could not be excluded as the source of the DNA on the vaginal swab or the underwear. The odds that the DNA on the swab came from someone other than Adams were 1 in 38,730,000,000,000. The odds that the DNA on the underwear came from someone other than Adams were 1 in 63,490,000,000,000,000,000.

**{¶ 68}** DNA analysis excluded Landers as the source of the DNA on the swab and the underwear.

**{¶ 69}** Passarello's DNA was found on Tenney's underwear, but his DNA was not found in the vaginal-semen sample.

*Procedural History*

**{¶ 70}** Almost three and one-half years after he was released on parole for the Boardman rape and related convictions, police officers arrested Adams and charged him with aggravated murder in connection with Tenney's 1985 death.

**{¶ 71}** On October 11, 2007, a grand jury returned a five-count indictment that was later superseded by an indictment returned on October 17, 2007. Count One charged Adams with aggravated felony murder (R.C. 2903.01(B)) with a single death-penalty specification, that Tenney's murder was committed in the course of or immediately after committing or attempting to commit rape, aggravated burglary, aggravated robbery, and kidnapping. R.C. 2929.04(A)(7). Count Two charged Adams with rape (R.C. 2907.02(A)(2)), with a violent-sexual-predator specification under R.C. 2941.148(A). The remaining counts of the indictment set forth charges for aggravated burglary (R.C. 2911.11(A)), aggravated robbery (R.C. 2911.01(A)), and kidnapping (R.C. 2905.01(A)).

---

[4] Blanchard testified at a pretrial hearing that police officers arrested Adams in October 2007 for the express purpose of obtaining his DNA.

**{¶ 72}** The trial court dismissed all counts but the aggravated-murder charge on statute-of-limitations grounds, and the case proceeded to trial. After hearing the evidence, the jury returned a guilty verdict on the aggravated-murder charge and the accompanying capital specification.

**{¶ 73}** Following the presentation of mitigation evidence, the jury returned a recommendation of death. The trial court adopted the jury's recommendation and sentenced Adams to death.

**{¶ 74}** Because this case involves a murder committed before January 1, 1995, Adams's direct appeal was heard first by a court of appeals. *See* Ohio Constitution, Article IV, Sections 2(B)(2)(c) and 3(B)(2); *State v. Davis*, 131 Ohio St.3d 1, 2011-Ohio-5028, 959 N.E.2d 516, ¶ 12-14. The appellate court affirmed the conviction and sentence. 7th Dist. Mahoning No. 08 MA 246, 2011-Ohio-5361. Adams timely appealed to this court.

## ANALYSIS

**{¶ 75}** Adams submits 21 propositions of law. We address them out of order.

### *Pretrial Issues*

### *Statute of limitations* **(Proposition of law XIII)**

**{¶ 76}** The trial court dismissed Counts Two through Five of the indictment before trial based on the statute of limitations for those offenses that was in effect when they allegedly were committed. Adams also sought dismissal of the capital specification attached to Count One, the aggravated-murder charge, on the theory that if the statute of limitations barred the state from proving the predicate felonies, then it necessarily followed that the state could not present evidence necessary to prove the specification based on those felonies. The trial court disagreed because aggravated murder (R.C. 2903.01) has no limitations period. R.C. 2901.13(A)(2).

**{¶ 77}** Adams argues that if the predicate felonies are time-barred, then the aggravated murder-count based on those felonies must also be time-barred. We do not agree.

**{¶ 78}** As our appellate courts have recognized, aggravated felony murder is a specific offense that is separate from the underlying felony, and the running of the statute of limitations on the underlying felony does not extinguish the aggravated-murder charge. *See, e.g., State v. Stansberry*, 8th Dist. Cuyahoga No. 78195, 2001 WL 755898, *3 (July 5, 2001) (conviction for aggravated murder in the course of an aggravated robbery was not time-barred, even though underlying charge of aggravated robbery was barred by statute of limitations); *State v. Brown*, 12th Dist. Clermont No. CA89-09-079, 1990 WL 165121, *4-5 (Oct. 29, 1990) (same). Similarly, our sister high courts have uniformly rejected the argument that an aggravated-felony-murder prosecution is time-barred if the predicate felonies are time-barred. *See, e.g., State v. Dennison*, 115 Wash.2d 609, 625-626, 801 P.2d 193 (1990); *State v. Jones*, 274 Ga. 287, 287-288, 553 S.E.2d 612 (2001); *State v. Lacy*, 187 Ariz. 340, 350, 929 P.2d 1288 (1996). *See also People v. Seals*, 285 Mich.App. 1, 13-16, 776 N.W.2d 314 (2009); *Jackson v. State,* 513 So.2d 1093, 1095 (Fla.App.1987).

**{¶ 79}** R.C. 2901.13(A)(2) plainly states that there is no statute of limitations for aggravated murder. We reject proposition of law XIII.

### *Speedy trial* (**Propositions of law V and XII**)

**{¶ 80}** A criminal defendant has a right to a speedy trial under the Ohio Revised Code, the Ohio Constitution, and the Fifth and Sixth Amendments to the United States Constitution. Before his trial, Adams timely moved for dismissal based on alleged speedy-trial violations. The trial court denied the motion. In propositions of law V and XII, Adams argues that the state violated his statutory and constitutional rights to a speedy trial by prosecuting him in 2007 for a crime committed in 1985.

*Statutory speedy-trial rights*

**{¶ 81}** The Revised Code requires that a person against whom a felony charge is pending shall be brought to trial within 270 days after the person's arrest. R.C. 2945.71(C)(2). Speedy-trial provisions are mandatory, and courts must strictly enforce them. *State v. Parker*, 113 Ohio St.3d 207, 2007-Ohio-1534, 863 N.E.2d 1032, ¶ 15; *State v. Hughes*, 86 Ohio St.3d 424, 427, 715 N.E.2d 540 (1999). If the defendant is not brought to trial in the allotted time, the trial court must discharge the defendant upon a timely motion. R.C. 2945.73(B).[5]

**{¶ 82}** Adams was arrested for Tenney's murder on October 4, 2007.[6] He concedes that his speedy-trial clock tolled on October 29, 2007, as a result of his counsel filing motions. It did not run after that because he later waived his speedy-trial rights. Because Adams was incarcerated during the time between October 4 and 29, 2007, he is entitled to triple-count the 24 days,[7] *see* R.C. 2945.71(E), for a total of 72 days on the speedy-trial clock.

**{¶ 83}** Adams asserts that his 2007 arrest for aggravated murder should "relate back" to his 1985 arrest for receiving stolen property and that the time he was incarcerated in 1985 and 1986 should also count for speedy-trial purposes. We disagree.

**{¶ 84}** A later indictment is not subject to the speedy-trial timetable of an earlier indictment or arrest "when additional criminal charges arise from facts different from the original charges, or the state did not know of these facts at the time of the initial indictment" or earlier arrest. *State v. Baker*, 78 Ohio St.3d 108, 110, 676 N.E.2d 883 (1997). As noted above, Adams was never indicted on the

---

[5] These same speedy-trial statutes were in effect when Adams was arrested on December 30, 1985. *See State ex rel. Dix v. Angelotta*, 18 Ohio St.3d 115, 116, 480 N.E.2d 407 (1985), fn. 1.

[6] Adams's brief filed in this court states his date of arrest as October 3, 2007, while the state's brief states the date of arrest as October 4, 2007. Our review of the evidence in the record and of Adams's pretrial motion to dismiss causes us to accept October 4, 2007, as the date of arrest.

[7] The day of arrest does not count when computing speedy-trial time. *State v. Nesser*, 2d Dist. Clark No. 2013 CA 21, 2014-Ohio-1978, ¶ 32; *State v. Semenchuck*, 8th Dist. Cuyahoga No. 90854, 2009-Ohio-465, ¶ 21.

charge of receiving stolen property. As the investigation progressed after his initial arrest, the evidence against him consisted of his possession of Tenney's ATM card, television, and keys and the telephone call from John Allie to Blanchard identifying Adams as the man at the ATM.[8]

{¶ 85} The most probative evidence linking Adams to the murder was unavailable to police officers at the time Adams was incarcerated after his 1985 arrest. Although investigators received the fingerprint analysis on January 29, 1986, and the lab report on the blood and semen samples, which excluded Landers and Passarello but not Adams, was completed on February 5, 1986, the key DNA test results were not available until after the investigation into the case was reopened in 2007.

{¶ 86} In the context here, we hold that the October 2007 murder indictment does not relate back to 1985 or 1986 for purposes of statutory speedy-trial analysis, because the evidence available in 2007 was not available at the time of the arrest in 1985 or in 1986. *State v. Brown*, 5th Dist. Stark No. 2007CA00129, 2008-Ohio-4087, ¶ 25 (later indictment did not relate back because it "was based on evidence that was not available at the time of the original charge"); *State v. Burrell*, 1st Dist. Hamilton No. C-030803, 2005-Ohio-34, ¶ 13 (trial court did not err in failing to dismiss case because later indictment was based on new facts). Therefore, the state did not violate Adams's statutory speedy-trial rights.

*Constitutional speedy-trial rights*

{¶ 87} In the second part of proposition of law XII, Adams claims that the state violated his constitutional right to a speedy trial under the Sixth Amendment

---

[8] The police also had a statement from Horace Landers implicating Adams. Landers told police officers that around Thanksgiving in 1985, Adams had said that he had stolen Tenney's keys, intending to use them to enter her apartment and steal her belongings. Landers also claimed that on the day he and Adams were arrested, he saw Adams wiping the common stairs to the second floor with a potholder and that Adams gave him some keys with instructions to throw them in the bathroom trash can. The statement was never admitted into evidence at trial.

to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

{¶ 88} To determine whether a defendant has been deprived of these constitutional speedy-trial rights, a court must balance four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of a speedy-trial right, and (4) the prejudice to the defendant. *State v. Selvage*, 80 Ohio St.3d 465, 467, 687 N.E.2d 433 (1997); *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

{¶ 89} But before engaging in any balancing test under *Selvage* and *Barker*, the court must make a threshold determination concerning the length of delay. " 'Until there is some delay *which is presumptively prejudicial*, there is no necessity for inquiry into the other factors that go into the balance.' " (Emphasis sic.) *State v. Hull*, 110 Ohio St.3d 183, 2006-Ohio-4252, 852 N.E.2d 706, ¶ 23, quoting *Barker* at 530. Thus, length of delay serves as a triggering mechanism for the rest of the *Barker* analysis. *Selvage* at 467; *Barker* at 530.

{¶ 90} A delay becomes presumptively prejudicial as it approaches one year in length. *Doggett v. United States*, 505 U.S. 647, 652, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992), fn. 1. The crux of Adams's constitutional argument is that the length of delay in his case was 22 years: the time between his initial arrest in 1985 and his indictment in 2007. But for constitutional speedy-trial-analysis purposes, most of that time does not count.

{¶ 91} When the government no longer holds a defendant under arrest or bail for a charge, the Speedy Trial Clause of the Sixth Amendment does not apply until the government rearrests or later indicts the defendant. *United States v. Loud Hawk*, 474 U.S. 302, 310-312, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986); *see also State v. Myers*, 97 Ohio St.3d 335, 2002-Ohio-6658, 780 N.E.2d 186, ¶ 65 (when calculating length of delay under *Barker*, two-year period between dismissal of murder charge and reindictment on same charge does not count).

The grand jury returned a "no bill" on the charge against Adams in May 1986, which halted the constitutional clock until his arrest in 2007.

{¶ 92} Adams argues that our decision in *State v. Meeker*, 26 Ohio St.2d 9, 268 N.E.2d 589 (1971), dictates a different result. The defendant in *Meeker* pleaded guilty to robbery in 1963. *Id*. at 10. Almost six years later, the common pleas court granted his motions to vacate the sentence and for a new trial. *Id*. The grand jury then indicted Meeker on four counts, including armed robbery and theft of a motor vehicle, all arising out of the same events as the original robbery charge. *Id*. at 10-11. We held that the speedy-trial clock began to run on all of the offenses when the state elected to charge Meeker only with robbery in 1963. *Id*. at 18.

{¶ 93} *Meeker* applies only when a defendant is subject to an official prosecution for at least one related offense. *See, e.g.*, *Selvage*, 80 Ohio St.3d at 466, 687 N.E.2d 433, fn. 1 (speedy-trial clock began to run when officer filed criminal complaint). The critical fact in *Meeker* that distinguishes it from the present case is that Meeker was in confinement during the entire six-year period for the earlier conviction. This was the basis on which we distinguished *Meeker* in *State v. Luck*, 15 Ohio St.3d 150, 153, 472 N.E.2d 1097 (1984): although 16 years passed between the crime and the indictment of Luck, Luck was never previously subject to arrest or indictment, and therefore his speedy-trial rights were never implicated and his speedy-trial clock did not begin to run before his indictment.

{¶ 94} Although Adams was incarcerated for much of the 22 years for the Boardman rape and related offenses, he was not subject to official prosecution or detention for crimes relating to Tenney after the grand jury declined to indict him in 1986. The clock began to run again only upon his 2007 arrest for Tenney's murder. *Doggett*, 505 U.S. at 655, 112 S.Ct. 2686, 120 L.Ed.2d 520; *United States v. Marion*, 404 U.S. 307, 320, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971) (Sixth

Amendment's Speedy Trial Clause does not apply prior to arrest, indictment, or other official accusation).

{¶ 95} Thus, for constitutional speedy-trial purposes, the only time we count is the period from Adams's arrest on December 30, 1985, to the grand jury's issuance of a "no bill" in May 1986, plus his 24 days of incarceration in October 2007. We hold that this period was not "presumptively prejudicial," and we therefore do not need to reach the other elements of the *Barker* inquiry.

*Preindictment delay*

{¶ 96} In proposition of law V, Adams claims that the delay in commencing his prosecution violated his constitutional rights of due process.

{¶ 97} The Due Process Clause of the Fifth Amendment provides limited protection against preindictment delay. *United States v. Lovasco*, 431 U.S. 783, 789-790, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *Marion*, 404 U.S. at 324-325, 92 S.Ct. 455, 30 L.Ed.2d 468. We have recognized a comparable due-process protection under Article I, Section 16 of the Ohio Constitution. *Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097, at paragraph two of the syllabus. *See State v. Walls*, 96 Ohio St.3d 437, 2002-Ohio-5059, 775 N.E.2d 829, ¶ 51-52.

{¶ 98} A defendant alleging a due-process violation based on preindictment delay must present evidence establishing substantial prejudice to his right to a fair trial. *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997); *Walls* at ¶ 51. Unlike a Sixth Amendment speedy-trial claim, no presumption of prejudice arises in the due-process context when a preindictment delay exceeds a particular length of time. *United States v. Schaffer*, 586 F.3d 414, 425 (6th Cir.2009). But a delay in commencing prosecution is not justified when the state uses the delay to gain a tactical advantage or through negligence or error ceases its investigation and then later, without new evidence, decides to prosecute. *Marion* at 324; *Luck* at 158.

**{¶ 99}** We have held that if the defendant makes a preliminary showing of substantial prejudice, then the burden shifts to the state to present evidence of a justifiable reason for the delay. *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998); *Walls* at 452-453. Some courts, including the Sixth Circuit, have held that under the Fifth Amendment, the defendant retains the burden of proof at all times and must affirmatively demonstrate *both* substantial prejudice to his right to a fair trial *and* that the delay was an intentional device by the government to gain a tactical advantage. *See Schaffer* at 424.

**{¶ 100}** The burden upon a defendant seeking to prove that preindictment delay violated due process is " 'nearly insurmountable,' " especially because proof of prejudice is always speculative. *United States v. Montgomery*, 491 Fed.Appx. 683, 691 (6th Cir.2012), quoting *Rogers* at 477, fn.10.

**{¶ 101}** Adams has failed to demonstrate substantial prejudice. Indeed, we find no evidence in the record that Adams was prejudiced by the passage of time prior to indictment. His claim thus fails to set forth a violation of the federal or Ohio Constitutions.

**{¶ 102}** At the hearing on the dismissal motion, Blanchard testified that Horace Landers died in May 1988. Adams points to the death of this witness as evidence of prejudice.

**{¶ 103}** The death of a potential witness during the preindictment period can constitute prejudice, but only if the defendant can identify exculpatory evidence that was lost and show that the exculpatory evidence could not be obtained by other means. *Rogers*, 118 F.3d at 475. Adams has failed to explain what exculpatory testimony Landers might have offered and thus has not established prejudice. *Id.* at 475-476; *United States v. Woods*, 6th Cir. No. 98-6452, 2000 WL 353516, *2 (Mar. 31, 2000). If anything, Landers's absence at trial was a benefit to Adams's defense because Landers had implicated Adams in the murder before he died. *Compare Luck*, 15 Ohio St.3d at 157-158, 472 N.E.2d

1097 (when defendant claimed that killing was in self-defense, the absence of a witness who saw the killing and could have corroborated the claim was prejudicial).

{¶ 104} Next, Adams alleges that some records of the 1986 grand jury proceedings against him, including witness testimony, have been lost. However, the trial court indicated that the grand jury transcripts were discovered, along with other (unidentified) files once thought lost. Adams objects that a *Miranda* form he signed was lost, but he does not explain how a missing *Miranda* waiver form might be exculpatory. *See United States v. Szilvagyi*, 417 Fed.Appx. 472, 479 (6th Cir.2011) (defendant failed to show that allegedly destroyed documents were exculpatory and that they had in fact been destroyed).

{¶ 105} Adams also complains that witnesses' memories had faded. But the possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice. *United States v. Marion*, 404 U.S. at 325-326, 92 S.Ct. 455, 30 L.Ed.2d 468.

{¶ 106} Finally, Adams claims that the delay prejudiced him because he was unable to recall the names of potential witnesses he saw at a party on December 29, 1985, who might have been able to supply him with an alibi. Adams wanted those alibi witnesses to place him at the party at the time fixed as the time of death by the coroner. But at trial, defense counsel elicited testimony from Dr. Germaniuk refuting the coroner's time-of-death calculation. Once the defense expanded the potential window for the time of death, the alibi witnesses became irrelevant.

{¶ 107} Because Adams fails to meet his burden to show prejudice, it is unnecessary for us to consider the reasons for the preindictment delay. *Schaffer*, 586 F.3d at 425. Nevertheless, we observe that Adams's allegation that the state intentionally delayed prosecution to create a tactical advantage does not withstand scrutiny.

24

**{¶ 108}** Adams contends that the delay conferred a tactical advantage on the prosecution because in 1991 we overruled prior precedent and announced new standards that made it easier to convict a defendant based purely on circumstantial evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraphs one and two of the syllabus, *overruling State v. Kulig*, 37 Ohio St.2d 157, 309 N.E.2d 897 (1974). Of course, in 1986 prosecutors could not have anticipated our decision in *Jenks,* which was still five years in the future. Thus, there is no showing that they delayed the prosecution of Adams to secure more favorable precedent to apply to him.

**{¶ 109}** Alternatively, Adams contends that the state's failure to try him in 1986 for any offenses involving Tenney, before he was convicted of the Boardman rape and related offenses, "certainly" impacted his decision whether to testify. As a preliminary matter, there is no evidence in the record that Adams actually intended to testify and was dissuaded from doing so, and thus there is no showing of substantial prejudice to him. *See State v. Williams*, 203 Or.App. 183, 190, 125 P.3d 93 (2005) (defendant failed to show substantial prejudice because there was no evidence that he intended to testify or regarding what he would have said on the stand). Even if the state waits until the conclusion of one prosecution before initiating a second, it does not automatically follow that the delay resulted from scheming to achieve a tactical advantage regarding the defendant's decision to testify. *Black v. Goord*, 419 F.Supp.2d 365, 372-373 (W.D.N.Y.2006).

**{¶ 110}** But the most significant flaw in Adams's theory is that if the state's true intention was to secure convictions in the Boardman case to use against him in the prosecution for Tenney's death, then logically the prosecution for Tenney's death should have commenced soon after he was convicted of the Boardman rape and related offenses in November 1986. Adams's theory fails to explain why the state waited two decades more to charge him in Tenney's death or how that delay benefited the state.

{¶ 111} We hold that Adams has failed to demonstrate a denial of his due-process right to a fair trial under either the Fifth Amendment or the Ohio Constitution.

*Findings of fact*

{¶ 112} Adams protests the trial court's failure to state its findings of fact when it denied his motion for dismissal. *See* Crim.R. 12(F). Crim.R. 12(F) is not self-executing; if a defendant does not request findings of fact, any error is forfeited. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 47. Even assuming that Adams properly requested findings (the request was a single sentence buried within a 35-page omnibus motion), we find that the trial court's findings satisfied its obligations under Crim.R. 12.

{¶ 113} With respect to the due-process claim, the trial court *did* make detailed findings of fact. The court expressly found (1) that Horace Landers's absence was not prejudicial, because he was a prosecution witness, (2) that the defense could not demonstrate the value of any potential alibi witnesses, and (3) that missing grand jury transcripts had been located.

{¶ 114} As for the Sixth Amendment and statutory speedy-trial claims, the trial court was not required to issue findings of fact before rejecting these claims. Crim.R. 12(F) requires a court to make findings of fact only "[w]here factual issues are involved in determining a motion." A court is not required to make findings of fact when the evidence is undisputed. *Bauer v. Cleveland Ry. Co.*, 141 Ohio St. 197, 203, 47 N.E.2d 225 (1943); *In re Haubeil*, 4th Dist. Ross No. 01CA2631, 2002-Ohio-4095, ¶ 8.

{¶ 115} The facts required to resolve these claims were not in dispute. The parties agreed that the grand jury refused to indict Adams for receiving stolen property in 1986 and that he was not arrested for murder until 2007. The rest of the analysis presents purely legal questions.

{¶ 116} Based on the foregoing, we reject propositions of law V and XII.

*Jury-Selection Issues*

*Voir dire time limits* **(Proposition of law I)**

{¶ 117} In his first proposition of law, Adams asserts that the trial court's imposition of short and arbitrary time limits during small-group voir dire prevented counsel from conducting a meaningful voir dire. Alternatively, he contends that the trial court's manner of questioning denied him meaningful voir dire.

{¶ 118} At the start of voir dire, the trial court divided the venire into panels of approximately five prospective jurors each. The small-panel sessions provided the only opportunity to question prospective jurors about the death penalty, their exposure to pretrial publicity, and their concerns about sequestration. The court limited each panel to one hour total.

{¶ 119} R.C. 2945.27 and Crim.R. 24(B) afford counsel the opportunity to conduct reasonable voir dire of prospective jurors. *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 48. But the length and scope of voir dire are within the sound discretion of the trial court "and vary depending on the circumstances of a given case." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, at ¶ 40. Time limits on voir dire questioning are permissible in capital cases, *State v. Nields*, 93 Ohio St.3d 6, 28, 752 N.E.2d 859 (2001), and will be deemed prejudicial only if they constitute a clear abuse of discretion, *State v. Cornwell*, 86 Ohio St.3d 560, 565, 715 N.E.2d 1144 (1999).

{¶ 120} Adams's attorneys never objected on the record to the time limits or requested additional time to inquire. We therefore review the matter only for plain error. *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 204 (failure to object waives all but plain error). " 'Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise.' " *State v. Adamson*, 72 Ohio St.3d 431, 434-435, 650

N.E.2d 875 (1995), quoting *State v. Moreland*, 50 Ohio St.3d 58, 62, 552 N.E.2d 894 (1990).

{¶ 121} It is impossible to know what information, if any, additional questioning of prospective jurors might have elicited. Thus, even assuming that the time limits for voir dire were too restrictive, we cannot say that but for the erroneous time limits, the outcome of the trial would have been otherwise. Therefore, we hold that no plain error occurred. *See State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 108 (there is no plain error when a claim is speculative).

{¶ 122} Alternatively, Adams objects to the manner in which the court questioned prospective jurors, describing it as "bullying" and "browbeating." In particular, the trial court pressed the members of panel 6 regarding their ability to follow the law. The court challenged those prospective jurors on the inconsistency of supporting capital punishment in the abstract while professing a personal inability to impose a capital sentence. The trial judge told panel members that if they sat on the jury that found Adams guilty and believed that the aggravating circumstance outweighed the mitigating factors, but nevertheless refrained from imposing a death sentence as the law required, then they would be guilty of juror misconduct.

{¶ 123} After the panel 6 members left the courtroom, the state moved to strike one of the prospective jurors for cause, and the defense moved to strike the entire panel for cause. Defense counsel expressed the opinion that the court's language, particularly the references to juror misconduct, could be construed as directing the prospective jurors to reach a specific death-penalty result later in the case. The trial court overruled both motions. Three members of panel 6 sat on the jury that convicted Adams and sentenced him to death.

{¶ 124} The trial court has a duty to ensure that jurors can fairly and impartially consider the death penalty in accordance with the law and to

28

determine whether they are unable to obey the law. *State v. Lundgren*, 73 Ohio St.3d 474, 481-482, 653 N.E.2d 304 (1995). Adams asserts that the trial court went too far in carrying out those purposes and predisposed jurors to impose the death penalty.

{¶ 125} We do not condone the trial court's questions and comments, but we find no abuse of discretion in the trial court's questioning of the panel.

{¶ 126} A trial court has wide discretion over both the questions allowed during voir dire and the manner in which voir dire is accomplished. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 54; *State v. Twyford*, 94 Ohio St.3d 340, 345, 763 N.E.2d 122 (2002). In hindsight, some of the trial court's remarks were inartful. In particular, we find that the repeated references to possible charges of juror misconduct were ill-chosen. But at no time did the court give an incorrect instruction of law or direct potential jurors to reach a specific verdict if they were impaneled. We decline to hold that the trial court abused its discretion in the manner that it conveyed correct information, but caution judges to be mindful that their role is to ensure that jurors are aware of what the law requires. That information usually can be conveyed without resorting to discussions of juror misconduct.

{¶ 127} Finally, Adams objects to certain gaps and inconsistencies in the record. For example, on the first day of voir dire, the court in chambers excused prospective juror No. 18 for cause. Shortly thereafter, the court indicated to counsel that prospective juror No. 18 would be part of panel 2, and no one commented or objected. The next day, counsel and the court questioned prospective juror No. 18 in the small-group session. Later, they questioned prospective juror No. 18 again during the final large-group voir dire.

{¶ 128} Ultimately, near the end of voir dire, the trial court in chambers sua sponte dismissed prospective juror No. 18 for cause, and in the process of doing so, inadvertently indicated that that prospective juror No. 18 may not have

been the same prospective juror No. 18 who was excused for cause on the first day. The trial court greeted the first prospective juror No. 18 as "sir," and later stated "[h]e's excused" when dismissing him for cause on the first day. The record suggests that the prospective juror No. 18 dismissed near the end of voir dire may have been female, as the trial court seems to have referred to that prospective juror by using the word "her" after that dismissal for cause.

{¶ 129} The record is unclear in other ways.

{¶ 130} As a representative example, according to the transcript, panel 8 included prospective juror No. 257, even though the trial court had earlier excused prospective juror No. 257 for cause on the first day of voir dire and even though prospective juror No. 257 was never mentioned again as the questioning of panel 8 progressed. And panel 8 included one prospective juror, prospective juror No. 290, who wandered in after the court had given lengthy instructions and who was later privately voir dired by the trial court. Many of the panels included multiple prospective jurors who were added without explanation, and some of the panels did not include prospective jurors who were scheduled to be on them but who apparently were excused without an explanation entered on the record.

{¶ 131} Applying a plain-error analysis, we cannot say that any concerns of this type affected the outcome of the trial. Indeed, the lack of comment or objection by any party suggests that the events in question were clear, at least at the time that they occurred, to the participants. We therefore reject proposition of law I.

### *Incomplete record* (**Proposition of law XVIII**)

{¶ 132} In proposition of law XVIII, Adams argues that the incomplete voir dire record denies him effective appellate review and therefore due process. He points not only to the removal and substitution of numerous potential jurors, but also the trial court's in-chambers discussion with prospective juror No. 175 prior to that prospective juror's excusal for cause.

{¶ 133} Adams bases his argument on our decision in *State v. Clinkscale*, 122 Ohio St.3d 351, 2009-Ohio-2746, 911 N.E.2d 862. *Clinkscale* involved the dismissal of a sitting, *deliberating* juror who purportedly was the sole dissenting vote against a verdict of conviction. *See id.* at ¶ 16-18. We held that the trial court's failure to make a record of the juror's dismissal was materially prejudicial because we could not determine if the trial court had obtained the consent of the parties before dismissing the juror. *Id*. at ¶ 18-20.

{¶ 134} *Clinkscale* is inapplicable here for three reasons.

{¶ 135} First, we agree with the reasoning of the court of appeals below that the removal of a deliberating juror, possibly because that juror is emerging as a "holdout" on the verdict, implicates constitutional rights in a way very different from any right associated with dismissing a *potential* juror from the jury pool. *See* 2011-Ohio-5361, at ¶ 220; *Clinkscale* at ¶ 15.

{¶ 136} Second, the trial court in this case *did* make a record of what occurred after the fact and gave the parties an opportunity to ask questions or be heard. *See State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 207.

{¶ 137} And third, Adams had already attempted to have prospective juror No. 175 removed, albeit for other reasons, before the trial judge sua sponte dismissed him. For these reasons, Adams cannot show prejudice by the dismissal of prospective juror No. 175 a day later.

{¶ 138} As for the other gaps in the record, this court will not reverse based on an incomplete record, even in a capital case, unless the appealing party demonstrates that he or she lodged an objection at the time or requested to have the matter placed on the record, attempted to reconstruct the record, and suffered material prejudice. *State v. Palmer*, 80 Ohio St.3d 543, 554, 687 N.E.2d 685 (1997). Adams lodged no objection to the dismissal of potential jurors and the

substitutions on the panels, made no effort to reconstruct the record, and has not demonstrated prejudice.

{¶ 139} We reject proposition of law XVIII.

### *For-cause excusals* (**Proposition of law XV**)

{¶ 140} In proposition of law XV, Adams contends that the trial court improperly dismissed two prospective jurors for cause. Adams argues that under R.C. 2945.25(C) and *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the trial court may excuse prospective jurors for cause during the death-qualification process only if the jurors unequivocally state that they will not recommend death under any circumstance.

{¶ 141} We have rejected this argument more than once. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 55. The constitutional standard governing dismissal of a prospective juror for cause based on opposition to the death penalty is set forth in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). Dismissal for cause is proper under R.C. 2945.25(O) if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and oath." *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶ 40.

{¶ 142} Prospective juror Nos. 55 and 233 both said that they could not sign a death verdict. It was proper to excuse them under R.C. 2945.25(O) because they could not perform their duties as jurors. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 86-92 (trial court did not abuse its discretion by excusing prospective juror who would not vote for death penalty even if the law required it).

{¶ 143} We reject proposition of law XV.

### *Pretrial publicity and venue* (**Proposition of law VIII**)

{¶ 144} In proposition of law VIII, Adams argues that the voir dire time constraints prohibited meaningful inquiry into the exposure of potential jurors to

prejudicial pretrial publicity, and he claims ineffective assistance of counsel based on trial counsel's failure to seek a change of venue.

{¶ 145} During voir dire, two members of panel 4, prospective juror Nos. 55 and 60, stated that they had heard about the case before coming to court. Prospective juror No. 55 had read in the newspaper that the police had not found the person who committed the murder in 22 years and that Adams's DNA matched the evidence in the case. The court asked prospective juror No. 55 whether she could be fair and impartial. At first, the prospective juror answered, "I think so," but when the court pressed for a more definitive response, the answer became "yes."

{¶ 146} The court then questioned prospective juror No. 60 about what he had heard. That prospective juror answered, "Primarily what this woman [prospective juror No. 55] said, what I've read in the paper, and after all these years and the DNA, seemed like they had the guy to me." Prospective juror No. 60 admitted to having already formed the opinion that Adams was guilty and stated that it would be hard to set that opinion aside.

{¶ 147} The court asked the other members of panel 4 if what they had just heard concerning DNA influenced them. Prospective juror No. 233 stated, "It makes you wonder, but no, I believe I should hear all the evidence, no."

{¶ 148} The court excused prospective juror No. 60 in front of the other members of panel 4. Outside the presence of the panel, the court later sua sponte excused prospective juror No. 55 for cause, not because of her exposure to information about the case, but based on her answers about whether she could sign a death-verdict form.

{¶ 149} The defense then moved to excuse all the remaining members of panel 4 for cause, based upon the comments about DNA made by prospective juror Nos. 55 and 60. The court denied the motion because the prospective jurors

all had said that they could be fair and impartial. One member of panel 4, juror No. 220, was eventually seated on the jury.

{¶ 150} We will not presume that improper comments tainted an entire jury panel. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 98. The party challenging the entire jury panel has the burden to show either that the jurors were unlawfully impaneled or that the jurors could not be fair and impartial. *State v. Knight*, 11th Dist. Portage No. 2008-P-0107, 2009-Ohio-4102, ¶ 13; *State v. Feagin*, 5th Dist. Richland No. 05 CA 1, 2006-Ohio-676, ¶ 23.

{¶ 151} Adams has presented no basis upon which we can conclude that juror No. 220, or anyone else who served on the jury that convicted Adams, was improperly influenced by the comments of prospective juror Nos. 55 and 60. We hold that the trial court did not abuse its discretion in denying the motion to excuse the entire voir dire panel.

{¶ 152} Alternatively, Adams claims ineffective assistance because his trial attorneys did not seek a change of venue based on pretrial publicity. But the decision whether to seek a change of venue is a matter of trial strategy and is thus not subject to second-guessing by a reviewing court as ineffective assistance. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 156.

{¶ 153} Moreover, it is unlikely that a change-of-venue motion would have been successful given the scant evidence of prejudicial publicity in the record.

{¶ 154} Some degree of media exposure is not sufficient to establish actual juror bias. *State v. Maurer*, 15 Ohio St.3d 239, 251-252, 473 N.E.2d 768 (1984). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Here, Adams has not shown that any juror failed to return a verdict based on the law and the evidence.

34

{¶ 155} We repeatedly have stated that voir dire is "the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." S*tate v. Bayless*, 48 Ohio St.2d 73, 98, 357 N.E.2d 1035 (1976); *see also State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 49 (listing cases).

{¶ 156} We reject proposition of law VIII.

### Batson *challenges* (**Proposition of law XVII**)

{¶ 157} Adams alleges that the state sought to exclude three prospective jurors for racially discriminatory reasons, in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

{¶ 158} First, Adams asserts that the state's for-cause challenge to prospective juror No. 301, an African-American woman who remained in the jury pool when the trial court declined to excuse her, was racially motivated. But *Batson* applies only to prospective jurors removed by peremptory challenge. *See id.* at 96-98.

{¶ 159} Next Adams argues that the trial court violated *Batson* when it upheld the state's peremptory challenges against two African-American prospective jurors (Nos. 11 and 31) without offering an independent analysis of the state's race-neutral justifications.

{¶ 160} When evaluating a *Batson* challenge, the trial court must determine, based on all the circumstances, whether the party opposing the peremptory challenge has proved purposeful discrimination. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 61. But the trial court may express its opinion of the state's race-neutral justification in the form of a clear rejection of the *Batson* challenge, without offering detailed findings, " '[a]s long as [the] trial judge affords the parties a reasonable opportunity to make their respective records.' " *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 98, quoting *Messiah v. Duncan*, 435 F.3d 186, 198 (2d Cir.2006).

{¶ 161} The trial court clearly rejected Adams's *Batson* challenges as to both prospective jurors after permitting the parties to make a record. As to prospective juror No. 11, the judge stated, "Okay. That is a race-neutral reason. Your *Batson* challenge is overruled." The trial court was just as unequivocal when discussing the *Batson* challenge to prospective juror No. 31: "[I]t's a racially-neutral reason. There were complaints about her from the beginning by the state, so I assumed the state was going to do that."

{¶ 162} We hold that the trial court met its obligations under *Batson* to review the evidence and independently assess the state's proffered race-neutral justifications for its peremptory challenges, and we therefore reject proposition of law XVII.

*Evidence-Suppression Issues*

*Violation of* **Miranda** *rights* **(Proposition of law XI)**

{¶ 163} In proposition of law XI, Adams asserts that he was interrogated while in custody after he had invoked his right to remain silent. Adams asks the court to vacate his conviction based on this purported *Miranda* violation.

{¶ 164} A suspect in police custody must be warned, before questioning, that he has the right to remain silent, that anything he says may be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him. *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6; *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 165} Before trial, Adams moved to suppress the statements that he had given to Soccorsy, his probation officer, in late 1985 and early 1986. At the motion hearing, retired Detective Michael Landers[9] testified that he first attempted to question Adams in the late afternoon of December 30, 1985, in an

---

[9] Detective Michael Landers was not related to Horace Landers, who was arrested along with Adams on December 30, 1985.

interrogation room at the Youngstown Police Department. Plainly, Adams was in custody at the time within the meaning of the Sixth Amendment. *Thompson v. Keohane*, 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (an individual is in custody for *Miranda* purposes when there has been an arrest or restraint on freedom of movement of the degree associated with formal arrest). Detective Landers testified that he read Adams his *Miranda* rights and that Adams did not request an attorney. Detective Landers identified a written notice of rights and waiver that had been signed by Adams on December 30, 1985. Despite signing the waiver, Adams refused to speak to officers, so the interview ended.

{¶ 166} Soccorsy also questioned Adams that day, in the Youngstown city jail. According to Soccorsy's testimony at the suppression hearing, he gave Adams *Miranda* warnings and had him sign a waiver, but the waiver form was destroyed, along with other materials in the file, over the years. Soccorsy testified that Adams made a statement during that interview, but he also testified that the statement did not include any details.

{¶ 167} Detective Landers testified at the suppression hearing that he again met with Adams the next day and asked more questions about the homicide. Detective Landers advised Adams of his rights that day and secured his signature on another standard waiver form. Again, Adams refused to speak to him, but Adams did not ask for an attorney. Detective Landers understood Adams to be invoking his right to remain silent.

{¶ 168} The second time Soccorsy interviewed Adams was on January 2, 1986, again in the Youngstown jail. Soccorsy reminded Adams that his *Miranda* rights still applied, but did not read him his rights again in full. Adams did not sign a waiver form at the second meeting, but Soccorsy testified that Adams *did* waive his rights and did make a statement that day. According to Soccorsy, at no time did Adams request an attorney.

**{¶ 169}** The trial court overruled the motion to suppress. As a result, Soccorsy testified at trial that he first interviewed Adams on December 30, 1985, at the Youngstown jail and that Adams waived his *Miranda* rights and denied committing any crime and denied having any knowledge of any crime.

**{¶ 170}** Soccorsy testified at trial that in a second interview on January 2, 1986, he asked Adams about Gina Tenney's ATM card. He then read verbatim from the notes he had taken of Adams's response:

> [O]n the morning of 12-30-85 at approximately 11:30 a.m., [Adams] went out to check the mailbox at 2234 Ohio Avenue. At this time he found a bank card belonging to Gina Tenney on the top step near the porch. He then rang Gina's doorbell to give her the card but there was no answer.
>
> The defendant then put Gina's card in his jacket pocket and intended to give it to her later.

Adams argues that the state failed to demonstrate a knowing, voluntary waiver of rights.

**{¶ 2}** *Right to counsel*

**{¶ 1}** When a suspect invokes his right to counsel, police officers must cease interrogation until counsel is present. *Edwards v. Arizona*, 451 U.S. 477, 484-485, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). However, for this principle to apply " 'the suspect must *unambiguously* request counsel.' " (Emphasis sic.) *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, 793 N.E.2d 446, ¶ 32, quoting *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994).

**{¶ 2}** Both Detective Landers and Soccorsy testified that Adams never requested counsel when they interviewed him, and nothing in the record

contradicts their testimony. Therefore, the trial court correctly found no violation of Adams's right to counsel.

*Right to remain silent*

{¶ 3} As with the right to counsel, the right to remain silent must be expressly invoked. *Berghuis v. Thompkins*, 560 U.S. 370, 380-382, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010). The record shows no express invocation by Adams of his right to remain silent.

{¶ 4} However, even in the absence of an express invocation, a defendant's statement is not admissible unless the prosecution shows that the defendant knowingly and voluntarily waived his or her *Miranda* rights when making the statement. *Thompkins* at 382. A voluntary waiver has two components: it must be a free choice, made in the absence of intimidation, deception, or coercion, and it must be " 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id*. at 382-383, quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

{¶ 5} There is no evidence that Adams was subjected to intimidation, deception, or coercion. *See Thompkins* at 386-387 (no evidence of coercion when police officers did not threaten the suspect, withhold food or sleep, or make him fearful). The mere fact that police officers later resume questioning does not constitute coercion. Police officers are permitted to resume questioning after a suspect invokes his right to silence, as long as they scrupulously honor the invocation by immediately ceasing the questioning and allowing a reasonable amount of time to pass. *Michigan v. Mosley*, 423 U.S 96, 104, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).

{¶ 6} The record supports the conclusion that Adams understood his rights. He had prior experience with the criminal-justice system and understood his rights well enough to remain silent when the arresting officers talked to him.

There is no allegation that a language barrier or cognitive defect prevented Adams from understanding the warning. *See United States v. Al-Cholan*, 610 F.3d 945, 953-954 (6th Cir.2010).

{¶ 7} A waiver of *Miranda* rights may be implied through " 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.' " *Thompkins*, 560 U.S. at 384, 130 S.Ct. 2250, 176 L.Ed.2d 1098, quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). In this case, the trial court correctly determined that Adams knowingly and voluntarily waived his rights. "Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." *Thompkins* at 384.

{¶ 8} We reject proposition of law XI.

### *Warrantless search* (Proposition of law IV)

{¶ 9} In proposition of law IV, Adams disputes the legality of the search that resulted in the discovery of Tenney's ATM card.

{¶ 10} Adams filed a pretrial motion to suppress the ATM card found in his jacket pocket. The trial court held an evidentiary hearing, at which Blanchard described the police officers' entry into the Adams/Fedelia apartment, the discovery and arrest of Horace Landers, and the subsequent search of the jacket pocket. On September 22, 2008, the trial court issued a judgment entry denying the motion to suppress.

{¶ 11} Under the Fourth Amendment to the United States Constitution, a search conducted without prior approval of a judge or magistrate is per se unreasonable, subject to certain well-established exceptions. *State v. Farris*, 109 Ohio St. 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 56 (Resnick, J., concurring in part and dissenting in part); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Courts must exclude evidence obtained by searches

and seizures that violate the Fourth Amendment. *State v. Jones*, 88 Ohio St.3d 430, 434, 727 N.E.2d 886 (2000), *abrogated in part on other grounds by State v. Brown*, 99 Ohio St.3d 323, 2003-Ohio-3931, 792 N.E.2d 175; *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**{¶ 12}** Blanchard testified that the search was incident to the arrest of Landers. An officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and of the area "within his immediate control." *Chimel v. California*, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The "search incident" exception has two rationales: protecting arresting officers and safeguarding evidence that the arrestee might conceal or destroy. *Arizona v. Gant*, 556 U.S. 332, 339, 129 S.Ct.1710, 173 L.Ed.2d 485 (2009).

**{¶ 13}** Adams argues that the search of the jacket pocket cannot be justified by concerns regarding officer safety, given that Landers was already handcuffed and unable to reach the jacket. But the right to search incident to arrest exists even if the item is no longer accessible to the arrestee at the time of the search. *United States v. Romero*, 452 F.3d 610, 619 (6th Cir.2006). As long as the arrestee has the item within his immediate control near the time of the arrest, the item can be searched. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir.2001).

**{¶ 14}** Adams argues that *Gant* and similar precedents should lead to a different result.

**{¶ 15}** In *Gant*, police officers conducted a warrantless vehicle search after the occupant was handcuffed and locked in a patrol car, and they discovered cocaine. The United States Supreme Court held that the search was unreasonable and that police officers may search a vehicle incident to arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search (or if another Fourth Amendment exception applies). *Id*. at 351.

**{¶ 16}** We believe that the search of the jacket was likely proper even under *Gant* because the jacket was within Adams's reach at the time. But we need not answer that question because *Gant* does not apply retroactively to a pre-*Gant* search that was undertaken in good-faith reliance on the binding precedents at the time. *Davis v. United States*, ___ U.S. ___, 131 S.Ct. 2419, 2434, 180 L.Ed.2d 285 (2011). In 1985, the controlling case was *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), which permitted the warrantless search of a jacket in a vehicle after the occupants had all been removed. *Id*. at 462-463. Under *Belton*, the search of Adams's jacket pocket in conjunction with the arrest of Landers was constitutional.

**{¶ 17}** Alternatively, Adams asserts that the police officers had only limited consent to enter the apartment for the purpose of using the telephone and that they unlawfully exceeded the scope of that consent when they entered the back bedroom without permission.

**{¶ 18}** Officers making arrests in a home are permitted to conduct a protective sweep, which is a " 'quick and limited search of [the] premises, incident to an arrest and conducted to protect the safety of [the] police officers [and] others.' " *United States v. Stover*, 474 F.3d 904, 911 (6th Cir.2007), quoting *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Police officers can conduct a protective sweep without making an arrest if circumstances warrant. *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1006-1007 (8th Cir.2010); *United States v. Taylor*, 248 F.3d 506, 513-514 (6th Cir.2001).

**{¶ 19}** In order for officers to undertake a protective sweep of an area, "they must articulate facts that would warrant a reasonably prudent officer to believe that the area to be swept harbored an individual posing a danger to those on the scene." *United States v. Biggs*, 70 F.3d 913, 915 (6th Cir.1995). In this case, the police officers were conducting a homicide investigation and had

42

consensually entered an apartment in which the resident (Adams) had stated that no one else was present. Despite being told that no one else was present in the apartment, the officers heard a loud noise indicative of a person hiding in a supposedly empty back room. Under these circumstances, we hold that the police officers were justified in investigating further and searching the back room and that they acted reasonably in sweeping the area to ensure that they were not in danger.

**{¶ 20}** We note also that Adams's motion to suppress filed in the trial court did not specifically challenge the officers' right to enter the back bedroom. The trial court's ruling on the motion issued after the hearing did not separately address this point. He raised this issue for the first time in the court of appeals and has therefore waived all but plain error as to it.

**{¶ 21}** Adams has presented no argument indicating that any error that may have occurred in this regard was outcome-determinative. Adams was already a "person of interest" to the police. After police officers interviewed Tenney's friends, Adams would have been clearly on their radar as a suspect. And once John Allie identified Adams as the man using Tenney's ATM card, the police officers would have had probable cause to take the DNA samples that eventually convicted Adams. We therefore find no plain error as to this aspect of his argument.

**{¶ 22}** We reject proposition of law IV.

*Trial Issues*

*Prospective-juror misconduct* **(Proposition of law XIV)**

**{¶ 23}** At some point while voir dire was being conducted, a prospective juror attempted to discuss the case with two other prospective jurors in a hallway outside the courtroom, in violation of the court's previous admonitions. According to the trial court, "Juror 175 was talking about the victim or I can't

forget the victim, that type of thing." In proposition of law XIV, Adams accuses the trial court of inadequately investigating that prospective juror's misconduct.

{¶ 24} However, " '[t]here is no *per se* rule requiring an inquiry in every instance of alleged [juror] misconduct.' " (Word in brackets sic.) *State v. Sanders*, 92 Ohio St.3d 245, 253, 750 N.E.2d 90 (2001), quoting *United States v. Hernandez*, 921 F.2d 1569, 1577 (11th Cir.1991). In this case, one of the three participants in the conversation, prospective juror No. 173, had been removed for cause before the conversation even came to light. When the court became aware of what prospective juror No. 175 had done, it dismissed that prospective juror for cause off the record for violating the court's instructions. The court later questioned prospective juror No. 176 on the record about that prospective juror's ability to be fair and impartial and was satisfied with prospective juror No. 176's response. We find that the trial court acted appropriately.

{¶ 25} Adams cites *State v. King*, 10 Ohio App.3d 161, 460 N.E.2d 1383 (1st Dist.1983), for the proposition that *all* juror misconduct is rebuttably presumed to be prejudicial. *See id*. at 165. We have repeatedly rejected that rule, and have held that a reviewing court will not reverse a judgment based on juror misconduct unless the complaining party demonstrates prejudice. *See State v. Keith*, 79 Ohio St.3d 514, 526, 684 N.E.2d 47 (1997), and cases cited therein. Adams has made no such showing.

{¶ 26} We reject proposition of law XIV.

### *Defense motion for a mistrial* (**Proposition of law IX**)

{¶ 27} During the cross-examination of Detective Blanchard, the defense unsuccessfully moved for a mistrial based on three allegedly improper and prejudicial statements Blanchard made. First, when asked if he had previously testified in the case, Blanchard volunteered that he had testified at two "suppression hearings." Second, when asked if he had had further conversations with Fedelia after talking to her on January 3, 1986, he replied "[n]ot about this

case." And third, Blanchard gave the name of the victim in the Boardman rape case in which Adams was convicted when asked about the witnesses who had been at the police lineup in early 1986.

{¶ 28} A trial court must declare a mistrial only "when the ends of justice so require and a fair trial is no longer possible." *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995). An appellate court reviews an order denying a motion for a mistrial for abuse of discretion. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). To show an abuse of discretion, the defendant must demonstrate material prejudice. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987).

{¶ 29} We find no abuse of discretion.

{¶ 30} The isolated reference to "suppression hearings" was not prejudicial, given that Blanchard did not state or insinuate that a defense suppression motion had been granted and evidence was being withheld from the jury.

{¶ 31} Likewise, his comment about talking to Fedelia was too ambiguous to be prejudicial. According to Adams, Blanchard's response—not about "this" case—was meant to inform the jury that there had been another criminal case against Adams. But depending on the intonation, the statement could have been understood by the jury to mean that Blanchard and Fedelia discussed a different case not involving Adams or that they discussed a topic not related to law enforcement at all.

{¶ 32} Finally, there are no indications that the jurors in 2008 would have recognized the name of a victim who was raped in 1985. Apart from stating the name, Blanchard said nothing about her. He did not indicate that she was a rape victim, inform the jury that Adams had been convicted of raping her, or give any details of any type.

**{¶ 33}** Adams cites *United States v. Blanton*, 520 F.2d 907 (6th Cir.1975), and *United States v. Forrest*, 17 F.3d 916 (6th Cir.1994), for the proposition that a conviction must be reversed when improper testimony is deliberately interjected into a trial. However, in *Blanton*, the defendant demonstrated what Adams cannot: that the evidence in question was unfairly prejudicial. *Id.* at 910. And in *Forrest*, even though the witness testified to the defendant's prior incarceration for robbery in direct violation of the judge's prior warning, the court of appeals held that a mistrial was not warranted. *Id.* at 919-921. Thus, neither case supports Adams's argument.

**{¶ 34}** On appeal, Adams has raised a new argument about Blanchard's testimony, namely that Blanchard violated the court's prohibition against witnesses testifying to *the reasons* that Tenney was afraid of Adams. But the testimony in question occurred *after* the defense moved for a mistrial, and the defense never renewed its motion for a mistrial or asked for a curative instruction. Moreover, the court sustained the defense's objection to this testimony. To the extent that Blanchard blurted out anything prejudicial before the court could rule, the defense should have requested a curative instruction, but did not. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, at ¶ 103 (motion for mistrial has no merit when court sustains objection and defendant never requests cautionary instruction).

**{¶ 35}** We reject proposition of law IX.

### *Ineffective assistance of counsel* (**Propositions of law XVI, VI, and VII**)

**{¶ 36}** To prove an allegation of ineffective assistance of counsel, a defendant must satisfy a two-prong test. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must establish that counsel's performance fell below an objective standard of reasonable representation. *Id*. And second, the defendant must show that he or she was prejudiced by the deficient performance. *Id*. A defendant establishes prejudice

by showing that but for counsel's errors, the result of the trial would have been different. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph three of the syllabus. Adams alleges two instances of ineffective representation by his counsel during trial.

*Failure to file suppression motion*

{¶ 37} In proposition of law XVI, Adams claims that he was denied the effective assistance of counsel because his trial counsel "failed to file a pretrial challenge to identification testimony offered at trial through the Allies." According to Adams, the lineup procedure was constitutionally defective because witnesses viewed the lineup together, John Allie signaled his wife during the lineup, John left the lineup without identifying anyone, and later, after he and his wife had time to confer, John called Blanchard to identify Adams.

{¶ 38} Due process may require a court to suppress eyewitness testimony when the identification results from an unduly suggestive identification procedure. *Foster v. California*, 394 U.S. 440, 442, 89 S.Ct. 1127, 22 L.Ed.2d 402 (1969). A lineup is unduly suggestive if it steers the witness to one suspect, independent of the witness's honest recollection. *Wilson v. Mitchell*, 250 F.3d 388, 397 (6th Cir.2001); *see also Jells v. Mitchell*, 538 F.3d 478, 511-512 (6th Cir.2008) (defendant was in a prison jumpsuit while the other participants were in street clothes). Adams has not identified any aspect of the lineup that demonstrates that police officers steered the Allies to identify him.

{¶ 39} Indeed, Adams's objection is directed primarily at the conduct of John and Sandra Allie, not the conduct of the police. When the questionable circumstances of an identification procedure are not due to state action, the reliability of the identification is a question going to the weight of the testimony, not its admissibility. *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 22; *State v. Brown*, 38 Ohio St.3d 305, 310-311, 528 N.E.2d 523 (1988).

**{¶ 40}** Adams argues that even if the lineup was not "unduly suggestive," due process requires a trial court to conduct a preliminary assessment of the reliability of an eyewitness identification. This argument has no merit.

**{¶ 41}** "[T]he Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Perry v. New Hampshire*, __ U.S. __, 132 S.Ct. 716, 730, 181 L.Ed.2d 694 (2012). Because a motion in limine to bar the identifications would not have been successful, it necessarily follows that Adams's trial counsel did not provide substandard representation by failing to file such a motion. Indeed, it was in the defense's interest to have the Allies testify, given that Sandra Allie had initially identified Horace Landers as the man she saw at the ATM.

**{¶ 42}** We reject proposition of law XVI.

*Failure to object to hearsay testimony*

**{¶ 43}** Tenney's friends testified that she was apprehensive about Adams or afraid of him and gave examples of Adams's intimidating behavior. Adams argues in proposition of law VI that Tenney's state of mind was irrelevant, that the court admitted testimony that did not satisfy the requirements of the excited-utterance hearsay exception, and that testimony regarding the reasons for Tenney's fear was improper "propensity" evidence.

**{¶ 44}** Robinson testified, "[T]he first time [Adams] called [, Tenney] called me right after and she was very upset, saying that Bennie called her and he was talking to her, asking her to [invite him] upstairs. * * * She said, I just got a call from Bennie. He was asking me if—why won't I let him come upstairs and talk to him." According to Robinson, Tenney said that she politely told Adams that she was busy, "just to get him off the phone."

**{¶ 45}** The court of appeals deemed this testimony admissible under a plain-error standard because, according to the appellate court, Adams never

48

objected at trial. *See* 2011-Ohio-5361, at ¶ 294-295. But Adams *did* object during Robinson's testimony, and the trial court overruled the objection.

{¶ 46} Evid.R. 803(2) creates a hearsay exception for a statement "relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Robinson testified that Tenney called him "right after" Adams had called her and was "very upset" and "stunned." We hold that the state laid a sufficient foundation to satisfy Evid.R. 803(2). *See State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, at ¶ 168-169 (declarant was still under the influence of startling event less than an hour after it occurred).

{¶ 47} Moreover, this hearsay testimony was relevant to establish motive. R.C. 2945.59 provides that "[i]n any criminal case in which the defendant's motive or intent * * * is material, any acts of the defendant which tend to show his motive or intent * * * may be proved, whether they are contemporaneous with or prior or subsequent thereto." The facts that Adams called Tenney late at night asking her if he could come up and that she rebuffed him are relevant to show motive when she was raped and murdered soon after.

{¶ 48} Adams also objects to the admission of hearsay statements that Tenney feared Adams. Robinson testified that Tenney had told him that she was afraid of Adams, and Thomas, when asked if Tenney had ever stated "who she was apprehensive or fearful of," said that she had told him that it was "[t]he man downstairs from where she lived."

{¶ 49} A victim's hearsay statements that she feared the defendant are admissible under Evid.R. 803(3) as declarations of the declarant's then-existing state of mind or emotion. *State v. Apanovitch*, 33 Ohio St.3d 19, 21, 514 N.E.2d 394 (1987). However, such hearsay testimony must still be relevant to the issues in the case. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 110.

**{¶ 50}** The capital specification against Adams included a charge that the murder occurred in the course of or immediately after a rape. R.C. 2907.02(A)(2) defines rape as sexual conduct resulting from the use or threat of force. The state demonstrated sexual conduct through the DNA evidence showing the presence of Adams's semen. Evidence that Tenney expressed fear of Adams to Thomas only hours before the sexual conduct occurred was relevant to prove absence of consent.

**{¶ 51}** The same analysis applies to the nonhearsay testimony regarding why Tenney was fearful. Sergeff testified, "Every time we pulled up in front of the building and came into the apartment [Adams] was always looking out the window or sometimes he would open the door and try to talk to us as we went up the stairs." Robinson testified about Tenney's reaction to receiving the card addressed "to a very sweet and confused young lady." This evidence is relevant to the narrative of a rejected courtship that prompted rape and murder.

**{¶ 52}** With respect to the late-night phone calls, Sergeff testified as to when Tenney changed her number and about the ring-pattern code they developed so that Tenney would know it was Sergeff calling and would answer her phone. Those statements describe events that Sergeff observed or participated in and are not hearsay. Adams now objects to Sergeff's testimony that the calls in question were coming from *him*. But Sergeff did not offer that fact until she was specifically asked *by the defense* on cross-examination to read a portion of her police statement into the record. Adams cannot object to the admissibility of testimony his counsel elicited. *State v. Simpson*, 2d Dist. Montgomery No. 19797, 2004-Ohio-669, ¶ 18-19.

**{¶ 53}** The final "act" testimony concerns the card Adams gave to Tenney. And once again, the fact that Adams sent Tenney a card addressed "to a very sweet and confused young lady" is relevant to the prosecution's theory of a rejected courtship that prompted rape and murder. Moreover, the only hearsay

that Robinson testified to in this context was that Tenney said, "Look what I found," after the card had been shoved under her door. The most significant portions of the testimony, such as the writing on the envelope and the fact that the card was signed by Adams, were based on Robinson's personal observations.

{¶ 54} Finally, Adams objects to testimony concerning how Tenney's friends perceived her state of mind. Examples of this testimony include Thomas's statement that she was "very apprehensive, concerned, borderline fearful but not there, not—she didn't strike me as being, you know, gravely afraid of the situation," Sergeff's testimony that Tenney "became afraid so she was afraid to answer" the telephone, and Passarello's testimony that Tenney "didn't feel secure in that apartment."

{¶ 55} A witness is permitted to testify as to his or her impressions of a victim's mental or emotional state. *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 100. Adams argues that Tenney's friends' subjective impressions of her emotional state are not relevant to any material fact at issue. Stated differently, Adams's argument is that testimony such as Thomas's opinion that Tenney seemed apprehensive is not relevant to proving whether or not Adams killed her. However, the testimony *is* relevant to establish that the sexual conduct was not consensual.

{¶ 56} We hold that the trial court did not abuse its discretion in admitting the testimony going to Tenney's state of mind. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62 (trial court has broad discretion over the admission of evidence). And because this testimony was admissible, Adams was not deprived of effective assistance of counsel when his attorneys failed to object.

{¶ 57} Adams also challenges the manner in which the trial court conducted the pretrial hearing on whether the state would be permitted to present

testimony at trial regarding Tenney's fear of Adams; the trial court treated the matter as a motion in limine and ruled in favor of the state after the hearing.

{¶ 58} At that hearing, the trial court allowed counsel for the parties to question Robinson about excited utterances Tenney may have made. The state also wanted Robinson and three other witnesses to be permitted to testify at trial regarding Tenney's general state of mind, and on that topic, the trial judge decided (without objection) that he alone would pose the questions to the witnesses. Adams now argues that in doing so, the trial judge impermissibly interjected himself into the proceedings in a way that was overly favorable to the state.

{¶ 59} A trial judge is permitted to interrogate witnesses in an impartial manner. Evid.R. 614(B). The trial judge's questioning of the four witnesses during the motion hearing was limited and designed to clarify a single issue, namely, their perception of Tenney's emotional state. Upon review of the transcript, we see no indication of " 'bias, prejudice, or prodding of a witness to elicit partisan testimony' " sufficient to demonstrate that the trial judge acted with impartiality. *State v. Baston*, 85 Ohio St.3d 418, 426, 709 N.E.2d 128 (1999), quoting *Jenkins v. Clark*, 7 Ohio App.3d 93, 98, 454 N.E.2d 541 (2d Dist.1982).

{¶ 60} We therefore reject proposition of law VI.

*Cumulative error*

{¶ 61} Adams, in proposition of law VII, argues that cumulative error occurred based on ten examples of nonfeasance by his trial counsel that, collectively, allegedly deprived him of effective assistance of counsel.

{¶ 62} We have already held that Adams's counsel were not ineffective for failing to file a motion to suppress eyewitness testimony (proposition of law XVI) or failing to object to state-of-mind and excited-utterance evidence (proposition of law VI). We have also rejected Adams's claim that his counsel performed ineffectively by failing to challenge venue (proposition of law VIII).

{¶ 63} We have also held that the trial court properly applied the *Witt* standard when qualifying prospective jurors (proposition of law XV), so that there was no error in that regard to which trial counsel should have objected. Likewise, the trial court did not err in its handling of the prospective juror's misconduct (proposition of law XIV), so counsel's failure to object on that ground was not ineffective assistance.

{¶ 64} Adams also cites counsel's failure to object to a capital specification containing four separate predicate felonies (proposition of law II). But as we discuss below, the omnibus capital specification was not improper.

{¶ 65} As for proposition of law XVIII, alleging the failure to ensure a complete record, Adams cannot demonstrate prejudice, because there is no evidence as to what the complete record would have revealed. *Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, at ¶ 209.

{¶ 66} Issues regarding counsel's failure to object to the constitutionality of Ohio's death penalty (propositions of law III and XX) are moot given our disposition of Adams's capital sentence.

{¶ 67} That leaves only one remaining allegation of ineffective assistance: counsel's failure to object to the voir dire proceedings (proposition of law I). Adams fails to demonstrate that he was prejudiced by any possibly deficient representation in that regard. And there can be no cumulative impact when we have not found any harmless error. *State v. Garner*, 74 Ohio St.3d at 64, 656 N.E.2d 623 (cumulative-error doctrine inapplicable when court does not find multiple instances of harmless error).

{¶ 68} Accordingly, we reject proposition of law VII.

### Jury-Instruction Issues

#### Requested jury instructions (Proposition of law X)

{¶ 69} In proposition of law X, Adams asserts that the trial court erred by refusing to give a jury instruction on involuntary manslaughter as a lesser

included offense of aggravated murder and refusing to instruct the jury on the law of circumstantial evidence as it existed in 1985.

{¶ 70} Requested jury instructions should ordinarily be given if they are correct statements of law, if they are applicable to the facts in the case, and if reasonable minds might reach the conclusion sought by the requested instruction. *Murphy v. Carrollton Mfg. Co.*, 61 Ohio St.3d 585, 591, 575 N.E.2d 828 (1991); see *State v. Griffin*, 141 Ohio St.3d 392, 2014-Ohio-4767, 24 N.E.2d 1147, ¶5. An appellate court reviews a trial court's refusal to give a requested jury instruction for abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). For the reasons discussed below, we hold that the trial court did not abuse its discretion, and we affirm the rulings of the trial court.

*Involuntary manslaughter*

{¶ 71} A charge on a lesser included offense is required " 'only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense.' " *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 192, quoting *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), paragraph two of the syllabus.

{¶ 72} Involuntary manslaughter is a lesser included offense of aggravated murder. *Thomas* at 216-217. The defense requested a jury instruction on involuntary manslaughter, which the trial court refused to give because, in the court's judgment, in this case "[t]here is no evidence of manslaughter. There's evidence of murder."

{¶ 73} At the time that the events at issue in this case occurred, the crime of involuntary manslaughter was subject to a six-year statute of limitations,[10]

---

[10] In 1998, the General Assembly enacted Sub.H.B. No. 49, effective March 1999, which amended R.C. 2901.13(A) to increase the statute of limitations for involuntary manslaughter and certain

which expired before Adams was indicted. Former R.C. 2901.13(A), Am.Sub.H.B. No. 511, 134 Ohio Laws, Part II, 1866, 1896. A defendant charged with a greater offense cannot be convicted of a lesser included offense if the statute of limitations has expired for the lesser offense. *State v. Price*, 10th Dist. Franklin Nos. 98AP-428 and 98AP-457, 1998 WL 896358, *4 (Dec. 22, 1998). This rule reflects the majority rule among the states. *See Cane v. State*, 560 A.2d 1063, 1064 (Del.1989), fn. 3. An involuntary-manslaughter instruction would have misled the jury into believing that it could convict Adams of a time-barred offense. *Spaziano v. Florida*, 468 U.S. 447, 455-456, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) ("Requiring that the jury be instructed on lesser included offenses for which the defendant may not be convicted * * * would simply introduce * * * distortion into the factfinding process").

{¶ 74} Moreover, although the Constitution requires a trial court in a capital case to charge the jury on some applicable lesser offense if one exists, *see id*. at 455-456, explaining and distinguishing *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the defendant does not get to select *which* lesser offense. *Schad v. Arizona*, 501 U.S. 624, 645, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). As long as the jury is instructed on *some* lesser offense that is supported by the evidence, the Constitution is satisfied. *Id*. In this case, the jury was instructed on the lesser offense of murder.

{¶ 75} In addition to those considerations, we agree with both lower courts that the evidence in this case did not warrant an instruction on involuntary manslaughter. Accordingly, the trial court did not abuse its discretion in not giving that instruction.

---

other offenses to 20 years. 147 Ohio Laws, Part I, 299. The amended statute does not apply to this case.

*Circumstantial evidence*

**{¶ 76}** At the time of Tenney's murder, the controlling precedent held that if the state relied upon circumstantial evidence alone to prove an essential element of a criminal offense, then the evidence had to be "consistent only with the theory of guilt and irreconcilable with any reasonable theory of innocence." *State v. Kulig*, 37 Ohio St.2d at 160, 309 N.E.2d 897. In such cases, the jury would be instructed, consistent with *Kulig*, that " 'circumstantial evidence, by itself, will justify a finding of guilt if the circumstances are entirely consistent with the defendants' guilt and are wholly inconsistent or irreconcilable with any reasonable theory of the defendants' innocence and are so convincing as to exclude a reasonable doubt of the defendants' guilt.' " *State v. Jenks*, 61 Ohio St.3d at 261, 574 N.E.2d 492, quoting 4 *Ohio Jury Instructions*, Section 405.03(2), 42 (1988).

**{¶ 77}** In 1991, we overruled *Kulig* and held:

> When the state relies on circumstantial evidence to prove an essential element of the offense charged, there is no need for such evidence to be irreconcilable with any reasonable theory of innocence in order to support a conviction. Therefore, where the jury is properly and adequately instructed as to the standards for reasonable doubt a special instruction as to circumstantial evidence is not required.

*Jenks* at paragraph one of the syllabus.

**{¶ 78}** Adams requested a jury instruction on circumstantial evidence consistent with *Kulig*. The trial court refused to give that instruction and instead gave a jury instruction consistent with *Jenks*. On appeal, Adams argues that the trial court, by retroactively applying *Jenks*, violated the Ex Post Facto Clause of

the United States Constitution, the Retroactivity Clause of the Ohio Constitution, and the Due Process Clauses of the state and federal Constitutions.

{¶ 79} In *State v. Webb*, 70 Ohio St.3d 325, 331, 638 N.E.2d 1023 (1994), we upheld the retroactive application of *Jenks*. We write now to clarify the governing principles in light of more recent decisions from this court and the United States Supreme Court.

{¶ 80} The Ex Post Facto Clause prohibits four types of legislative enactments:

> "1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime*, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*."

(Emphasis sic.) *Carmell v. Texas*, 529 U.S. 513, 522, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000), quoting *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798); *see also State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, ¶ 50.

{¶ 81} The Ex Post Facto Clause of the United States Constitution and the Retroactivity Clause of the Ohio Constitution are not relevant to this case.

{¶ 82} The federal constitutional prohibition on ex post facto laws applies only to *statutory* changes enacted by the legislature, " 'and does not of its own force apply to the Judicial Branch of government.' " *Rogers v. Tennessee*, 532

U.S. 451, 456, 121 S.Ct. 1693, 149 L.Ed.2d 697 (2001), quoting *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977); *Webb*, 70 Ohio St.3d at 330, 638 N.E.2d 1023, fn. 1. Likewise, Article II, Section 28 of the Ohio Constitution, the Retroactivity Clause, is expressly a limitation on the power of the General Assembly and does not apply to judicially created rules. *Id*. at 331. Adams's reliance on those provisions is without merit.

{¶ 83} The ability of the judiciary to apply its rulings retroactively is limited, but that limitation is imposed by principles of due process. *Id*. at 330, fn. 1; *Rogers* at 456; *Bouie v. Columbia*, 378 U.S. 347, 350, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). The due-process limitations on the judiciary are not coextensive with the limitations placed on legislatures by the Ex Post Facto Clause. *Metrish v. Lancaster*, ___ U.S. ___, 133 S.Ct. 1781, 1788, 185 L.Ed.2d 988 (2013). Rather than incorporating the four specific ex post facto prohibitions identified in *Calder v. Bull*, the due-process limitations rest on "core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously has been innocent conduct." *Rogers* at 459.

{¶ 84} "[J]udicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is ' "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." ' " *Rogers* at 462, quoting *Bouie* at 354, quoting Hall, *General Principles of Criminal Law* 61 (2d Ed.1960); *see also State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 32.

{¶ 85} In simple terms, *Rogers* held that the due-process analysis incorporates the first three *Calder v. Bull* categories, whereas the Ex Post Facto Clause incorporates all four. *Janecka v. Cockrell*, 301 F.3d 316, 325 (5th Cir.2002); *Reed v. Cockrell*, 269 F.Supp.2d 784, 810-812 (N.D.Tex.2002), *rev'd*

*on other grounds, sub nom. Reed v. Quarterman*, 555 F.3d 364 (5th Cir.2009). Stated differently, "unexpected and indefensible" means a substantive change to the law that increases a defendant's criminal liability, and a change of that type violates due process. A procedural change to the manner in which a criminal case is adjudicated, on the other hand, does not implicate due-process concerns. *State v. Jess*, 117 Haw. 381, 408-409, 184 P.3d 133 (2008). For example, due-process limitations do not apply to changes to the rules of evidence. *United States v. Johnson*, 354 F.Supp.2d 939, 968 (N.D.Iowa 2005) (retroactive application of "forfeiture by wrongdoing" hearsay exception did not implicate due-process concerns).

**{¶ 86}** We hold that instructing the jury pursuant to *Jenks* did not deprive Adams of due process. The legal change from *Kulig* to *Jenks* did not expose him to criminal liability for conduct that was legal before the change, *Bouie* at 354-355; *Webb* at 331, or increase the potential punishment for the same conduct, *State v. Elmore,* 122 Ohio St.3d 472, 2009-Ohio-3478, 912 N.E.2d 582, ¶ 18. The change in the jury instruction brought about by *Jenks* was a procedural change, not a substantive change to the elements of the crime or the punishment for the offense. *Reed v. Cockrell*, 269 F.Supp.2d at 812 (holding that the fourth *Calder* category does not apply to retroactive application of a judicial decision abrogating the requirement that a jury instruction on circumstantial evidence that is favorable to a criminal defendant must be given).

**{¶ 87}** In sum, we hold that the trial court's jury instruction on circumstantial evidence did not violate due process. Based on this determination and our earlier conclusion that an instruction on involuntary manslaughter would have been inappropriate, we reject proposition of law X.

### *Omnibus capital specification* (**Proposition of law II**)

**{¶ 88}** Adams was convicted of aggravated murder, under R.C. 2903.01(B), for having purposely caused the death of Gina Tenney while

committing, attempting to commit, or fleeing after committing rape, kidnapping, aggravated robbery, or aggravated burglary. Similarly, the original capital indictment included a single death-penalty specification that listed four of the predicate offenses mentioned in R.C. 2929.04(A)(7), namely rape, aggravated burglary, aggravated robbery, *and* kidnapping.

{¶ 89} On April 14, 2008, the state moved pursuant to Crim.R. 7(D) to amend the indictment to replace the word "and" with "and/or" in the list of predicate offenses. The trial court granted the motion soon after it was filed.

{¶ 90} At the close of the evidence, the trial court instructed the jury that it should find the specification proved if it found that Adams committed any of the underlying felony offenses. The trial court stated:

> In the specification attached to Count One, you must decide whether the State proved beyond a reasonable doubt that the aggravated murder was committed while the Defendant was committing, attempting to commit or fleeing after committing or attempting to commit rape, aggravated burglary, aggravated robbery, *or* kidnapping.

(Emphasis added.) The trial court never instructed the jurors that to find that the R.C. 2929.04(A)(7) specification had been proved, they needed to be unanimous as to which underlying felony or felonies Adams committed.

{¶ 91} The jurors unanimously signed two verdict forms. The first form found Adams guilty of "the offense of aggravated murder of Gina Tenney." On the second form, the jurors entered a finding of guilty as to the offense of "aggravated murder while he was committing, attempting to commit or fleeing immediately after committing or attempting to commit rape, aggravated burglary,

aggravated robbery, or kidnapping and Bennie L. Adams was the principal offender in the aggravated murder."

{¶ 92} In his second proposition of law, Adams contends that it was error for the trial court to give the jury a single omnibus R.C. 2929.04(A)(7) specification without instructing the jurors that they had to return a unanimous verdict as to each predicate felony in the specification for that felony to qualify as a supporting underlying offense. Adams has *not* challenged the sufficiency of the evidence as to each predicate offense. Rather, his theory is that the instructions and jury forms left open the possibility of a nonunanimous jury verdict as to the capital specification, and therefore violated his constitutional right to a unanimous verdict.

{¶ 93} We rejected a similar argument in *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, in which we stated that "when the jury unanimously reaches a verdict, the individual jurors need not agree on which of the alternatives bases support their individual findings." *Id*. at ¶ 64; *see Schad v. Arizona*, 501 U.S. at 643-644, 111 S.Ct. 2491, 115 L.Ed.2d 555 (plurality opinion). As long as the jury unanimously convicts the defendant of aggravated murder, the jurors need not be unanimous as to the predicate offense or offenses the defendant committed. *Johnson* at ¶ 65; *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 187-188.

{¶ 94} We recognize that *Johnson* dealt with a felony-murder conviction based on alternative predicate offenses, whereas Adams is objecting to the finding of guilt on the capital specification. But in terms of a defendant's constitutional right to a unanimous jury verdict, the analysis is the same.

{¶ 95} The concurring in part and dissenting in part opinion of Justice Lanzinger in this case maintains that the United States Supreme Court's decision in *Schad* has been superseded by a more recent line of decisions beginning with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000),

and culminating in *Alleyne v. United States*, 570 U.S. ___, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). However, *Apprendi* and its progeny have nothing to do with the problem of nonunanimous jury verdicts.

{¶ 96} *Apprendi* and the cases that build on it address an unrelated legal issue: whether a trial court may enhance a criminal defendant's sentence based on facts not found by the jury. At issue in *Apprendi* was a New Jersey law that increased the maximum term of imprisonment for certain felonies from 10 years to 20 years if the trial judge found that the defendant committed the crime with "a purpose to intimidate" based on racial bias or other listed biases. *Id*. at 468-469. The Supreme Court declared the law unconstitutional because it permitted a judge to make a finding of fact, by a preponderance of the evidence, to increase a defendant's sentence to a statutory maximum penalty. *Id*. at 490-492.

{¶ 97} *Apprendi* stands for the proposition that if a particular fact exposes a defendant to an enhanced maximum term of imprisonment, the fact must be found by the jury by proof beyond a reasonable doubt. *Id*. at 490. Thus, in capital cases, the aggravating circumstances that make a defendant death-eligible must be found by the jury. *Ring v. Arizona*, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). And *Alleyne* makes clear that facts that serve to increase a mandatory *minimum* sentence must also be found by the jury, not the trial court judge. *Alleyne* at 2163, *overruling Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002).

{¶ 98} By invoking the *Apprendi-Alleyne* line of cases to analyze the nonunanimous jury instruction, the separate opinion confuses two distinct lines of jurisprudence. As the high court of Massachusetts has explained:

> In substance, the *Apprendi* and *Ring* cases are about the constitutional limitations imposed on who may decide a factor or factors that increases a defendant's maximum punishment and not

about the need for *jury* unanimity when returning a general verdict under a particular theory of murder.

(Emphasis sic.) *Commonwealth v. Almonte*, 444 Mass. 511, 524, 829 N.E.2d 1094 (2005), *overruled in part on other grounds*, *Commonwealth v. Carlino*, 449 Mass. 71, 865 N.E.2d 767 (2007).

{¶ 99} The inapplicability of *Apprendi* is obvious if one asks a simple question: what *fact* did the trial court find to make Adams death-eligible? The answer is: none. Adams became death-eligible when the jury unanimously found him guilty of aggravated murder in the course of some predicate felony. The fact that the jury may not have been unanimous as to which predicate felony he committed is obviously troubling to the author of this separate opinion, but *Apprendi* and its progeny are inapposite to that perceived problem. *See, e.g., Crawford v. State*, 121 Nev. 744, 750, 121 P.3d 582 (2005) ("*Apprendi* does not undermine the rationale of our holdings respecting jury unanimity on alternative theories of murder and provides no support for revisiting our reasoning on that issue"); *Spears v. Mullin*, 343 F.3d 1215, 1236, (10th Cir.2003), fn. 20 ("*Apprendi* does not indicate in any way that it overrules *Schad*").

{¶ 100} We reject proposition of law II. It follows that Adams's contention (in proposition of law VII) that his trial counsel's failure to object to the jury instructions and verdict forms deprived him of the effective assistance of counsel is also without merit.

{¶ 101} Based on the foregoing, we affirm Adams's conviction on the sole count of aggravated murder. We thus turn to his claims regarding the imposition of a death sentence.

*Independent Review of the Death Sentence*

{¶ 102} R.C. 2929.05(A) imposes four responsibilities on this court as we conduct our appellate review. We must determine (1) whether the evidence

supports the jury's finding of the aggravating circumstance, the R.C. 2929.04(A)(7) capital specification, (2) whether the trial court properly weighed the aggravating circumstance against the mitigating factors present, (3) whether, in our independent judgment, the aggravating circumstance outweighs the mitigating factors, and (4) whether the sentence of death is appropriate. In conducting our independent review, we afford no deference to the conclusions of the trial court or the court of appeals. *See State v. Fox*, 69 Ohio St.3d 183, 194-195, 631 N.E.2d 124 (1994).

### *Sufficiency of the evidence as to the aggravating circumstance*

{¶ 103} The sole aggravating circumstance in this case was framed in terms of alternative means: a single crime (aggravated murder) that might have been committed in any of four ways (murder in the course of rape, kidnapping, aggravated robbery, or aggravated burglary). *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 182-188 (noting that the predicate offenses named in R.C. 2929.04(A)(7) are alternative means to support the offense of aggravated felony murder). In a typical "alternative means" case, the jury must be unanimous as to the defendant's guilt of the crime charged, but need not be unanimous as to the means by which the crime was committed. *Id*. For purposes of our analysis here, in which we focus on the capital specification rather than on the aggravated-murder offense itself, the predicate offenses listed in the R.C. 2929.04(A)(7) capital specification are "alternative means" of establishing that an offense of aggravated murder meets the criteria for imposing a death sentence. To find that the R.C. 2929.04(A)(7) specification has been proved when more than one predicate offense is alleged, the jury must unanimously find beyond a reasonable doubt that the defendant committed aggravated murder during the course of one or more of the alleged predicate offenses, but the jury need not unanimously agree on which predicate offense was committed.

{¶ 104} In a case such as this one, jury unanimity is not required as to the means underlying the capital specification so long as substantial evidence supports each alternative means. *See State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, ¶ 49 (plurality opinion).

{¶ 105} The state assumed the burden of producing sufficient evidence as to each of the alternative means of the R.C. 2929.04(A)(7) specification here, given the way the omnibus capital specification was presented to the jury. Accordingly, the principles we apply can be stated as follows: In an appeal of a death sentence based on an R.C. 2929.04(A)(7) specification when more than one predicate offense is alleged but the jury has not made a finding as to which predicate offense was committed, a reviewing court must determine under R.C. 2929.05(A) whether there is sufficient evidence to support each of the alternative predicate-offense theories. The appellate court must determine whether a rational trier of fact could have found each means of committing the crime of aggravated murder in the course of the alleged R.C. 2929.04(A)(7) predicate offenses proved beyond a reasonable doubt. When an appellate court reviews the sufficiency of the evidence pursuant to R.C. 2929.05(A) as to the R.C. 2929.04(A)(7) aggravating circumstance in an aggravated-murder case in which more than one predicate offense is alleged but the jury has not made a finding as to which predicate offense was committed and determines that the state proved some but not all of the alleged alternative means that could establish the aggravating circumstance, the evidence is, as a matter of law, insufficient to support a death sentence and the death sentence must be vacated.

{¶ 106} The DNA test results matching Adams to the semen sample, along with the testimony from Tenney's friends indicating that she would not have engaged in consensual sex with him, constitute sufficient evidence to establish the predicate offense of rape, pursuant to R.C. 2907.02(A)(2).

**{¶ 107}** We also hold that this evidence, coupled with the testimony regarding the presence of ligature marks on Tenney's wrists, is sufficient evidence that Adams restrained Tenney's liberty for the purpose of engaging in sexual activity with her against her will. *See* R.C. 2905.01(A)(4), defining the crime of kidnapping.

**{¶ 108}** The state also presented sufficient evidence to establish the predicate offense of aggravated robbery. At the time of the offense, former R.C. 2911.01(A)(2), defining aggravated robbery, provided that no person, "in attempting; or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after such offense or attempt, shall * * * [i]nflict, or attempt to inflict serious physical harm on another." Am.S.B. No. 210, 140 Ohio Laws, Part I, 583, 590. And the definition of "theft offense" in R.C. 2913.01(K)(1) then, as now, included the crime of aggravated robbery under R.C. 2911.01. *See* Sub.S.B. No. 183, 140 Ohio Laws, Part I, 505, 510.

**{¶ 109}** The testimony at trial established a sufficient basis for the jury to conclude that Adams robbed Tenney of her ATM card, apartment key, and car key and that he inflicted serious physical harm in the process. The fact that his intent when he attacked Tenney may have been rape, and that he may have decided to seize those items only after she was dead, is of no legal consequence. *See State v. Twyford*, 94 Ohio St.3d at 354, 763 N.E.2d 122, and cases cited therein (rejecting the argument that no robbery occurs if the victim is already dead at the time of the theft).

**{¶ 110}** However, based on the evidence presented at trial, we hold that there was not sufficient evidence to establish that Adams committed aggravated burglary.

**{¶ 111}** The state presented evidence that Adams likely was inside Tenney's apartment at some point. Her television, with his fingerprints on it, was in his apartment. He had a blue tissue in his pants pocket that may have matched

tissues that were found in her kitchen and had a potholder from her kitchen in his apartment. And the testimony from Tenney's friends supports an inference that Adams's presence in Tenney's apartment was not with her permission.

{¶ 112} But aggravated burglary requires more than proof of trespass. *State v. Howard*, 8th Dist. Cuyahoga No. 85500, 2005-Ohio-5135, ¶ 12-13. The state never committed to a single theory of where and under what circumstances the rape and murder occurred, and in presenting its evidence, the state failed to prove the essential elements that distinguish aggravated burglary from simple trespass.

{¶ 113} Aggravated burglary requires proof that the defendant trespassed "by force, stealth, or deception." R.C. 2911.11(A). Blanchard testified that he saw no fresh signs of forcible entry into Tenney's apartment, which undercuts a theory that Adams forced his way through the door. Although it is possible that Adams entered through stealth or deception, there was no probative evidence of either. The state never directly addressed the manner by which Adams secured entry to the apartment, and absent evidence of that type, the finding of the specification pertaining to that underlying offense cannot stand. *See Howard* at ¶ 8-14 (reversing conviction for aggravated burglary because state presented no evidence of how defendant entered house).

{¶ 114} One possible theory of the crime is that Adams attacked Tenney outside her apartment, raped and killed her at some other location, then later used her keys to gain access. But under that scenario, the state would have failed to prove two essential elements of aggravated burglary. First, if Adams raped and killed Tenney in another location, then he would not have caused her "physical harm" while inside her domicile, an "occupied structure." R.C. 2911.11(A)(1). *See State v. Wade*, 10th Dist. Franklin No. 06AP-644, 2008-Ohio-1797, ¶ 9 (aggravated burglary's element of trespass by force, stealth, or deception is "separate and distinct from the requirement that the State prove appellant

inflicted, attempted, or threatened to inflict physical harm"). And second, to establish that Adams committed aggravated burglary, the trial court instructed the jury that the state was required to show that at the time he entered the apartment, a person was present or likely to be present. *See* former R.C. 2911.11(A), Am.S.B. No. 210, 140 Ohio Laws, Part I, 583, 590; *State v. Fowler*, 4 Ohio St.3d 16, 17-19, 445 N.E.2d 1119 (1983) (construing former R.C. 2911.11(A); *State v. Wilson*, 58 Ohio St.2d 52, 58-59, 388 N.E.2d 745 (1979) (construing former R.C. 2911.11(A)). Tenney lived alone. So if Adams abducted Tenney outside her apartment, she could not have been present in the apartment when Adams later returned with the keys. The state presented no evidence to suggest that anyone else was present or likely to be present in the apartment at whatever time Adams entered it.

{¶ 115} It is also possible that Adams accosted Tenney outside her apartment, forced her to admit him to the upstairs apartment, and raped and killed her there. But this scenario is purely speculative. The state presented no direct physical evidence to establish where the rape occurred. It presented no evidence of blood or semen stains found in the apartment, and no witness testified to seeing evidence of a struggle. Nor was there circumstantial evidence that the rape occurred in the apartment (for example, that her bed was stripped and the sheets missing).

{¶ 116} As we recognized in *State v. Gardner*, 135 Ohio St.3d 99, 2012-Ohio-5683, 984 N.E.2d 1025, at ¶ 24, "There is always a temptation in criminal cases to let the end justify the means, but as guardians of the Constitution, we must resist that temptation." The state chose to undertake to prove that Adams committed a specific offense, aggravated murder in the course of aggravated burglary, and by doing so, assumed the affirmative duty to prove all elements of aggravated burglary in proving the capital specification. It failed to do so, and that failure cannot be remedied by flinging a plank of hypothesis across an abyss

of uncertainty, *see Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 103, even when the plank is flung by an appellate court charged with reviewing the sufficiency of the evidence to support a jury's verdict on the ensuing specification. Simply put, a capital specification that leads to a death sentence cannot be upheld based on mere supposition and speculation rather than evidence establishing the specification beyond a reasonable doubt.

{¶ 117} Given all the unknowns surrounding the commission of aggravated burglary, we are compelled to conclude that no rational trier of fact could find beyond a reasonable doubt that Adams committed that offense.

{¶ 118} And we are compelled to hold that the state's success in proving *some* of the alternative means cannot make up for its failure to prove *all* the suggested means by which Adams may have committed the aggravating circumstance. *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 49. Because the state failed to produce sufficient evidence to prove all elements of aggravated burglary, we find insufficient evidence to support the finding on the R.C. 2929.04(A)(7) capital specification.

{¶ 119} Our holding today regarding the capital specification does not affect Adams's underlying conviction for aggravated murder. The concurring in part and dissenting in part opinion of Justice O'Donnell calls it "logically inconsistent" for us to vacate the capital specification based on insufficient evidence, but not to vacate the underlying felony-murder conviction. *Id*. at ¶ 134. Of course, the reason for this apparent inconsistency should be obvious: R.C. 2929.05(A) requires us to determine whether the evidence supports the jury's finding of the aggravating circumstance. We have no comparable authority to review the sufficiency of the evidence as to the underlying conviction on our own initiative. To the contrary, R.C. 2929.05(A) specifically directs us to review convictions "in the same manner that [we] review other criminal cases." Adams has not challenged the sufficiency of the evidence supporting his aggravated-

murder conviction, so the question is not before us, and we decline to consider it sua sponte.

**{¶ 120}** As indicated above, we adopted the rule that each possibility in an alternative means case must be supported by sufficient evidence in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 49. This separate opinion urges us to abandon this rule in favor of the rule adopted in *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). Because the reasoning of *Griffin* has been subjected to legitimate criticism and discredited for several reasons, we decline to do so.

**{¶ 121}** *Griffin* held that in federal prosecutions, a general verdict based on alternative means will be sustained if the evidence warrants a guilty verdict on one theory of guilt, even if there is insufficient evidence of guilt as to an alternative theory. *Id*. at 56-57. *Griffin* was premised on a dubious assumption of juror infallibility: the jury will always disregard an unproven theory and convict only on the proven theory. *Id*. at 59.

**{¶ 122}** The *Griffin* assumption defies experience and common sense. As the Supreme Judicial Court of Massachusetts explained, "[i]f the premise of the Supreme Court's position were correct, a jury would never return a guilty verdict when the evidence was insufficient to warrant that verdict, and we know that is not so." *Commonwealth v. Plunkett*, 422 Mass. 634, 640, 664 N.E.2d 833 (1996). When the Supreme Court of California adopted *Griffin* with modifications, one justice who did not accept the court's reasoning thoroughly dissected *Griffin*:

> First, the premise of jury "infallibility" is unsupported. Jurors may be "well equipped" to determine pure questions of fact. But their expertise does not extend to mixed questions of law and fact— which include the sufficiency of the evidence. Second, the premise of jury "infallibility" is subversive. If it obtained, we would be

compelled to dismiss at the very threshold *each and every* insufficient-evidence claim raised against *any* verdict of guilt. For we would then be required to conclude that if the evidence had indeed been lacking, the jury would *necessarily* have discerned the deficiency and could not *possibly* have rendered a guilty verdict. Thus, the bare fact of the verdict would establish the sufficiency of the evidence as a matter of law.

(Emphasis sic.) *People v. Guiton*, 4 Cal.4th 1116, 1132-1133, 17 Cal.Rptr.2d 365, 847 P.2d 45 (1993) (Mosk, J., concurring in judgment only). This illogical result is precisely what the separate opinion of Justice O'Donnell urges this court to adopt.

{¶ 123} Ohio is far from an outlier in rejecting *Griffin*. The Supreme Court of Washington was the first to reject *Griffin* and hold that its state law demands sufficient evidence of each alternative means. *State v. Ortega-Martinez*, 124 Wash.2d 702, 707-708, 881 P.2d 231 (1994). A year later, in a felony-murder case involving multiple predicate felonies, the Supreme Court of New Jersey held that "when there is sufficient evidence to support two or more alternative felony theories, a jury need not designate which felony theory it relies on to convict one of felony murder so long as there is sufficient evidence to sustain each felony." *State v. Harris*, 141 N.J. 525, 562, 662 A.2d 333 (1995). And one year later, the high court of Massachusetts delineated the logical fallacy at the heart of *Griffin*. *Plunkett*, 422 Mass. at 640, 664 N.E.2d 833.

{¶ 124} The same rule governs "alternative means" prosecutions in Wyoming, *see Bloomquist v. State*, 914 P.2d 812, 819 (Wyo.1996), and Oklahoma, *see Ullery v. State*, 1999 OK CR 36, 988 P.2d 332, ¶ 32, fn. 48 ("In the absence of any underlying felony convictions, this Court will support a general verdict of murder only where sufficient evidence supports *both*

alternatives charged" [emphasis sic]). Kansas requires a "super-sufficiency" of evidence in alternative means cases. *See State v. McClelland*, 301 Kan. 815, 819, 347 P.3d 211 (2015). And in Hawaii, unanimity as to alternative means is not required only if "there is *no reasonable possibility* that the jury's verdict was based on an alternative unsupported by sufficient evidence." (Emphasis added). *State v. Jones*, 96 Haw. 161, 181, 29 P.3d 351 (2001).[11]

{¶ 125} The separate opinion strives to create an impression of overwhelming consensus in favor of *Griffin*, but the effort is unconvincing. As the cases from our sister courts make clear, the states are far from one mind on this topic. And the separate opinion's recitation of 12 separate federal appellate court cases adopting *Griffin* shows nothing more than the compliance of the federal courts with the United States Supreme Court's mandate in *Griffin.*

{¶ 126} As additional support for the *Griffin* rule, the separate opinion cites an opinion from Maine that actually holds the exact opposite. *State v. Fortune*, 2011 ME 125, 34 A.3d 1115. Fortune was convicted of aggravated attempted murder by alternative means: "pre-meditation-in-fact" and "extreme cruelty." The Supreme Judicial Court of Maine affirmed the conviction because the evidence was "more than sufficient" to prove *both* alternative means. *Id*. at ¶ 36.

{¶ 127} The *Fortune* opinion discussed *Griffin* in the context of the defendant's argument that because he was indicted on a single count of attempted murder involving three victims, the jury should have been instructed that it had to agree unanimously as to which person or persons was the victim. *Id*. at ¶ 24, 28. The court held that a trial court *should* give such an instruction when requested,

---

[11] Given the amount of attention the state lavished on the property taken from Tenney's apartment, we cannot say there is "no reasonable possibility" that the jury's verdict was not based, at least in part, on the aggravated-burglary charge.

but Fortune had not made the request; instead, he asked for an instruction that the jury had to convict him unanimously as to all three. *Id*. at ¶ 30-31.

{¶ 128} This aspect of *Fortune* is irrelevant to the present case because the court treated the multiple-victim scenario as a "multiple acts" case, akin to when multiple theft or drug transactions are cited in a single charge. *Id*. at ¶ 31. The "meaningful" distinction between alternative means and multiple acts cases is fundamental to our jurisprudence. *Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 51. The separate opinion's failure to appreciate the significance of this distinction likely accounts for its reliance on *State v. Johnson*, 46 Ohio St.3d 96, 545 N.E.2d 636 (1989). The issue in *Johnson* concerned a single charge that the defendant murdered the victim while committing aggravated robbery, or while attempting to commit aggravated robbery, or while fleeing immediately after committing aggravated robbery, or while fleeing immediately after attempting aggravated robbery—a classic "multiple acts" scenario. *Id*. at 105.

{¶ 129} The separate opinion counts California in support of its view but California adopted a modified version of *Griffin*. Under California law, "the appellate court should affirm the judgment unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty *solely* on the unsupported theory." (Emphasis added.) *Guiton*, 4 Cal.4th at 1130, 17 Cal.Rptr.2d 365, 847 P.2d 45. *Griffin* expressly rejected this type of approach. *See* 502 U.S. at 58, 112 S.Ct. 466, 116 L.Ed.2d 371.

{¶ 130} Based on the foregoing, we must vacate Adams's sentence of death and remand the case to the trial court for a new sentencing hearing. When an appellate court reviews the sufficiency of the evidence to support a capital specification and determines that the evidence is, as a matter of law, insufficient to support a death sentence and vacates the death sentence, the state is barred by the Double Jeopardy Clause of the United States Constitution from seeking the

death penalty on remand. *See Burks v. United States*, 437 U.S. 1, 16-18, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (the Double Jeopardy Clause precludes a second trial once the reviewing court has found the evidence legally insufficient).

## CONCLUSION

{¶ 131} Given our decision to vacate the sentence of death, we hold that propositions of law XX and XXI, concerning the constitutionality of Ohio's death penalty, and proposition of law XIX, challenging the trial court's refusal to give a mercy instruction, are moot.

{¶ 132} We hereby vacate the sentence of death and remand the cause to the trial court for a new sentencing hearing consistent with this decision and pursuant to R.C. 2929.06(A).

> Judgment affirmed in part
> and vacated in part,
> and cause remanded.

PFEIFER, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL and KENNEDY, JJ., concur in part and dissent in part.

LANZINGER, J., concurs in part and dissents in part.

_____

**O'DONNELL, J., concurring in part and dissenting in part.**

{¶ 133} Respectfully, I dissent from the decision of the majority to vacate the sentence of death on its finding of insufficient evidence to support a capital specification and to remand this case for a new sentencing where imposition of capital punishment is precluded.

{¶ 134} In my view, the majority opinion is logically inconsistent. It affirms Adams's conviction for aggravated murder for having purposely caused the death of Gina Tenney while committing rape, kidnapping, aggravated robbery, or aggravated burglary, stating, "As long as the jury unanimously convicts the defendant of aggravated murder, the jurors need not be unanimous as to the

predicate offense or offenses the defendant committed." Majority opinion at ¶ 93. The majority apparently does not require the state to establish each alternative means of committing the offense of aggravated murder by sufficient evidence, because it upholds Adams's conviction notwithstanding its determination that there is no evidence he committed the aggravated burglary.

{¶ 135} However, in its independent review of the death sentence, it states, without citation to binding authority,

> When an appellate court reviews the sufficiency of the evidence * * * in an aggravated-murder case in which more than one predicate offense is alleged but the jury has not made a finding as to which predicate offense was committed and determines that the state proved some but not all of the alleged alternative means that could establish the aggravating circumstance, the evidence is, as a matter of law, insufficient to support a death sentence and the death sentence must be vacated.

Majority opinion at paragraph four of the syllabus. The majority then vacates the death sentence based on the state's failure to prove Adams committed an aggravated burglary, one of the alternative means of establishing the aggravating circumstance in this case.

{¶ 136} The majority never adequately explains why the same analysis it employs in reviewing the determination of guilt is also not employed for a sentencing review. If the evidence of guilt is sufficient to support a finding of guilt of aggravated murder, it is also sufficient to uphold the penalty recommended by the same jury that found guilt, because in order to prove an aggravated murder conviction and the aggravating circumstance necessary to

impose the sentence of death in this case, the state is required to prove the same elements beyond a reasonable doubt.

{¶ 137} The majority's position also runs counter to *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991), and *Sochor v. Florida*, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992), where the court upheld general jury verdicts notwithstanding the state's failure to prove beyond a reasonable doubt each of the alternative means presented to the jury.

{¶ 138} In *Griffin*, a federal grand jury indicted Diane Griffin and two others with conspiracy to defraud a federal agency with the objects of impairing the efforts of the Internal Revenue Service ("IRS") to determine income taxes and impairing the efforts of the Drug Enforcement Administration ("DEA") to ascertain forfeitable assets. *Id.* at 47. At trial, the evidence failed to connect Griffin to the conspiracy to impair the efforts of the DEA, but the trial court nonetheless instructed the jury in a manner that permitted it to return a guilty verdict against Griffin "if it found her to have participated in *either one* of the two objects of the conspiracy"—i.e., impairing the efforts of the IRS or impairing the efforts of the DEA. (Emphasis sic.) *Id.* at 48. The jury returned a general verdict finding Griffin guilty, and the appellate court upheld the conviction, rejecting the argument that the general verdict could not stand because it left in doubt whether the jury had convicted her of conspiring to defraud the IRS, for which there was sufficient proof, or of conspiring to defraud the DEA, for which there was not. *Id.*

{¶ 139} The Supreme Court affirmed, explaining,

> It was settled law in England before the Declaration of Independence, and in this country long afterwards, that a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds—even though that gave no assurance that

> a valid ground, rather than an invalid one, was actually the basis
> for the jury's action.

*Id*. at 49. It then articulated the prevailing rule: " '[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive, * * * the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " *Id.* at 56-57, quoting *Turner v. United States,* 396 U.S. 398, 420, 90 S.Ct. 642, 24 L.Ed.2d 610 (1970).

{¶ 140} The court stated that when a jury returns a general verdict on a count of an indictment that alleges alternative means of committing the offense, it is presumed that the jury entered the verdict only on grounds supported by sufficient evidence. *Id.* at 49-50. Noting that "jurors *are* well equipped to analyze the evidence," the court declined to negate the verdict " 'merely on the chance—remote, it seems to us—that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient.' " (Emphasis sic.) *Id.* at 59-60, quoting *United States v. Townsend,* 924 F.2d 1385, 1414 (7th Cir.1991).

{¶ 141} More directly on point, in *Sochor*, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326, the court applied these principles to a capital case where insufficient evidence proved one of the four aggravating circumstances supporting imposition of the death penalty. The jury had found Dennis Sochor guilty of first-degree murder and kidnapping, and in the penalty phase of the proceeding, the trial court charged the jury on four aggravating circumstances—that he had a prior conviction for a violent felony, that he committed murder in the course of committing a felony, that the murder was especially heinous, atrocious, or cruel, and that the murder was committed in a cold, calculated, and premeditated manner. *See Sochor v. State*, 580 So.2d 595, 603 (Fla.1991), fn. 2. The jury recommended the death penalty without specifying which aggravating

circumstances it had found, and the trial court adopted the jury's recommendation. On appeal, the Supreme Court of Florida determined that the coldness factor had not been proven by the state, but it nonetheless upheld the death sentence, because after removing the coldness factor from consideration, the sentence of death was proportionate to Sochor's crime. *Id.* at 603-604.

{¶ 142} On direct review, the United States Supreme Court declined to presume that the jury relied on the coldness factor in finding that the aggravating circumstances outweighed the mitigating circumstances. Relying on *Griffin*, the court rejected Sochor's suggestion that the death sentence must be set aside "if the jury was allowed to rely on any of two or more independent grounds, one of which is infirm," explaining that "it was no violation of due process that a trial court instructed a jury on two different legal theories, one supported by the evidence, the other not," because a jury "is indeed likely to disregard an option simply unsupported by evidence." *Sochor,* 504 U.S. at 538, 112 S.Ct. 2114, 119 L.Ed.2d 326. The fact that the jury had been presented with an aggravating circumstance not supported by sufficient evidence therefore did not violate due process or the Eighth Amendment. (Although the United States Supreme Court found against Sochor on this issue, it vacated the judgment of the Florida Supreme Court on other grounds, i.e., the Florida Supreme Court's failure to explain or declare its belief that the trial court's express weighing of the coldness factor which had not been proven by sufficient evidence was harmless beyond a reasonable doubt in that it did not contribute to the sentence obtained. *Id.* at 540-541.)

{¶ 143} Recent decisions from every federal circuit court of appeals demonstrate that *Griffin* and *Sochor* remain binding federal constitutional law. *E.g., United States v. Mensah*, 737 F.3d 789, 811 (1st Cir.2013); *United States v. Desnoyers*, 637 F.3d 105, 109 (2d Cir.2011); *United States v. Tyler*, 732 F.3d 241, 253 (3d Cir.2013); *United States v. Robinson*, 627 F.3d 941, 956 (4th Cir.2010);

*United States v. Garza-Robles*, 627 F.3d 161, 166 (5th Cir.2010); *United States v. Dedman*, 527 F.3d 577, 599 (6th Cir.2008); *United States v. Borrero*, 771 F.3d 973, 976 (7th Cir.2014); *United States v. Boyle*, 700 F.3d 1138, 1143 (8th Cir.2012); *United States v. Hui Hsiung*, 778 F.3d 738, 760 (9th Cir.2015), fn. 10; *United States v. Schulte*, 741 F.3d 1141, 1149 (10th Cir.2014); *United States v. Bradley*, 644 F.3d 1213, 1250 (11th Cir.2011); *United States v. Johnson*, 216 F.3d 1162, 1165 (D.C.Cir.2000).

**{¶ 144}** Further, the weight of authority from our sister supreme courts demonstrates that a general verdict is not subject to reversal when the jury is presented with alternative means supporting a finding of guilt, as long as at least one of those alternative means is supported by sufficient evidence. *E.g., Commonwealth v. Knox*, 105 A.3d 1194, 1197-1198 (Pa.2014); *Batiste v. State*, 121 So.3d 808, 840 (Miss.2013); *Kaczmar v. State*, 104 So.3d 990, 1003 (Fla.2012); *State v. Santiago*, 305 Conn. 101, 183, 49 A.3d 566 (2012), citing *State v. Chapman*, 229 Conn. 529, 539, 643 A.2d 1213 (1994); *State v. Fortune*, 2011 ME 125, 34 A.3d 1115, ¶ 29; *People v. Becoats*, 17 N.Y.3d 643, 654, 934 N.Y.S.2d 737, 958 N.E.2d 865 (2011); *State v. Berry*, 227 W.Va. 221, 230, 707 S.E.2d 831 (2011); *State v. Mailman*, 148 N.M. 702, 2010-NMSC-036, 242 P.3d 269, ¶ 11; *Inyamah v. United States*, 956 A.2d 58, 62 (D.C.2008); *Norris v. State*, 2010 Ark. 174, 6, 368 S.W.3d 52; *Gordon v. State*, 121 Nev. 504, 507-508, 117 P.3d 214 (2005), citing *Rhyne v. State*, 118 Nev. 1, 10, 38 P.3d 163 (2002); *State v. Manning*, 885 So.2d 1044, 1086 (La.2004); *People v. Dunaway*, 88 P.3d 619, 631 (Colo.2004); *People v. Sanchez*, 26 Cal.4th 834, 851, 111 Cal.Rptr.2d 129, 29 P.3d 209 (2001); *Gonzalez v. State*, 8 S.W.3d 640, 641 (Tex.Crim.App.2000); *People v. Griffin*, 178 Ill.2d 65, 83-84, 687 N.E.2d 820 (1997).

**{¶ 145}** And the holdings of *Griffin* and *Sochor* are consistent with Ohio case law. Notably, in *State v. Johnson*, 46 Ohio St.3d 96, 545 N.E.2d 636 (1989), we accepted "the assumption that, 'when a jury returns a guilty verdict on an

indictment charging several acts in the conjunctive * * * the verdict stands if the evidence is sufficient with respect to any one of the acts charged.' " *Id.* at 104, quoting *Turner v. United States*, 396 U.S. at 420, 90 S.Ct. 642, 24 L.Ed.2d 610.

**{¶ 146}** The majority's attempt to distinguish *Johnson* and *Fortune*, 2011 ME 125, 34 A.3d 1115, as multiple-act cases is questionable. Initially, there is no indication that the distinction between alternative-means and multiple-act cases in any way affects the analysis in these circumstances.

**{¶ 147}** In *Johnson*, the charge and capital specification were similar to Adams's—felony murder with the predicate offense of aggravated robbery. *See* 46 Ohio St.3d at 104-106, 545 N.E.2d 636. Here, Adams could have been found to have committed the aggravating circumstance based on an even greater array of acts as stated in the second verdict form signed by the jury, i.e., "aggravated murder while he was committing, attempting to commit or fleeing immediately after committing or attempting to commit rape, aggravated burglary, aggravated robbery, or kidnapping."

**{¶ 148}** In *Fortune*, the court *distinguished* cases in which "separate, similarly situated victims or similar incidents such as thefts or drug transactions are the evidence supporting a single charge," *id.* at ¶ 31, explaining that in the case before that court, "the attempted murder charged in Count 8 was really one incident of the charged offense, not three incidents with three separate victims," *id.* at ¶ 33. Only in this context did the court address *Griffin*.

**{¶ 149}** In addition, three of the states listed by the majority as "rejecting" the *Griffin* analysis appear to have never addressed it in the first instance; and those jurisdictions, at least in part, trace their holdings to federal cases that predated and were later distinguished by *Griffin*. *See State v. Harris*, 141 N.J. 525, 562, 662 A.2d 333 (1995), citing *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931); *Cloman v. State*, 574 P.2d 410, 412 (Wyo.1978), citing *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356

(1956), and *United States v. Natelli*, 527 F.2d 311, 325 (2d Cir. 1975); and *McGregor v. State*, 1994 OK CR 71, 885 P.2d 1366, 1376, fn. 19, citing *Yates*. Thus, it is not clear that New Jersey, Wyoming, and Oklahoma would not follow *Griffin*, especially given the weight of authority supporting it.

{¶ 150} The majority correctly mentions four jurisdictions that reject the rule from *Griffin*. Those courts did so, however, on independent state law grounds. *E.g., State v. Owens*, 180 Wash.2d 90, 95, 323 P.3d 1030 (2014), fn. 2 (rejecting *Griffin* on the basis that "the right to a unanimous jury verdict in criminal trials in Washington is rooted in article I, section 21 of our state constitution and not the federal constitution"); *State v. Jones*, 96 Haw. 161, 181, 29 P.3d 351 (2001) (rejecting *Griffin* on the basis that "the due process protection under the Hawai'i constitution is not necessarily limited to that provided by the United States Constitution"); *State v. Owen*, 344 P.3d 956, 2015 WL 1309978, *6 (Kan.2015) (memorandum opinion) ("based upon Kansas precedent applying Kansas law, the Court of Appeals correctly determined that the State was required to present sufficient evidence to support each alternative means on which the jury was instructed").

{¶ 151} But in contrast to those cases, the majority identifies only a plurality opinion in Ohio supporting its holding. The assertion that "we adopted the rule that each possibility in an alternative means case must be supported by sufficient evidence in *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, 889 N.E.2d 995, at ¶ 49," majority opinion at ¶ 120, is a stretch. *Gardner* was a plurality opinion, and because four justices declined to join it, nothing in that opinion can be characterized as a holding of this court. *See* Article IV, Section 2(A), Ohio Constitution; *Fed. Home Loan Mtge. Corp. v. Schwartzwald*, 134 Ohio St.3d 13, 2012-Ohio-5017, 979 N.E.2d 1214, ¶ 29. And, although *Gardner*'s observation on this point has never been adopted by this court as the law in Ohio, *Gardner* nonetheless purported to apply the *federal* Due Process

Clause, *id.* at ¶ 47-50, and that approach cannot stand in light of *Griffin*, which held that due process does not require all alternative means to be proven by sufficient evidence.

{¶ 152} Nor does the majority rely on the due process protections afforded by Article I, Section 16 of the Ohio Constitution as providing any greater protection than does the United States Constitution in these circumstances. *See In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 17 ("the due-process rights provided by the Fourteenth Amendment and those provided by Article I, Section 16 of the Ohio Constitution are coextensive"); *State v. Bode*, ___ Ohio St.3d ___, 2015-Ohio-1519, ___ N.E.3d ___, ¶ 31, 33 (French, J., dissenting) (explaining that the "due course of law" provision in the Ohio Constitution is equivalent to the "due process of law" clause in the Fourteenth Amendment and should be similarly construed absent compelling reasons why Ohio constitutional law should differ from federal law).

{¶ 153} In cases of this distinction where neither a verdict form requesting a specific finding nor an interrogatory was submitted to the jury, we presume, as the Supreme Court directs us to in *Griffin* and *Sochor*, that the jury acted rationally, honestly, and intelligently and disregarded any alternative means of committing the capital specification not proven by the evidence. Nothing in this record affirmatively demonstrates that the jury relied on the aggravated burglary allegations to support the capital specification charged in this case—and in his brief to this court, Adams did not challenge the sufficiency of the evidence supporting the aggravating circumstance found by the jury, likely because the jury heard overwhelming and compelling evidence that Adams raped and kidnapped Tenney.

{¶ 154} Accordingly, neither the language of the Eighth Amendment nor principles of due process requires this court to negate the jury's verdict that Adams committed the murder in the course of committing rape, kidnapping,

aggravated robbery, or aggravated burglary pursuant to R.C. 2929.04(A)(7). And the aggravating circumstance in this case outweighs the mitigating factors beyond a reasonable doubt. Thus, there is no reason to negate the imposition of the death sentence, and I would affirm the judgment of the court of appeals.

KENNEDY, J., concurs in the foregoing opinion.

_____

**LANZINGER, J., concurring in part and dissenting in part.**

{¶ 155} I concur only in the court's decision to vacate Bennie Adams's sentence of death based upon the state's failure to produce sufficient evidence of aggravated burglary. But I respectfully dissent from the majority's syllabus statements, analysis, and affirmance of the conviction in this case, because I believe that the wording of the jury's verdict also invalidates the guilty verdict on the charge of aggravated murder.

{¶ 156} Adams was tried for aggravated murder based upon a charge of felony murder under R.C. 2903.01(B), which states that "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, * * * aggravated robbery, * * * [or] aggravated burglary." The statutory language applicable to this case thus sets forth the possibility of any one of four different offenses, rather than merely "a felony," as the predicate offense for felony murder.

{¶ 157} The jury's verdict form at issue specifies:

> We the jury in this case, duly impaneled, affirmed, and sworn, find the defendant Bennie L. Adams, guilty of committing the offense of aggravated murder while he was committing, attempting to commit or fleeing immediately after committing or attempting to commit rape, aggravated burglary, aggravated

robbery or kidnapping and Bennie L. Adams was the principal offender in the aggravated murder.

{¶ 158} The jury was required to find that at least one of the four felonies listed was proved beyond a reasonable doubt as a predicate offense to support aggravated murder and the felony-murder capital specification. And as an element of the offense of aggravated murder and the capital specification, the particular predicate offense was to be found by the jury beyond a reasonable doubt.

{¶ 159} But because the jury's verdict is worded in the disjunctive—rape, aggravated burglary, aggravated robbery, *or* kidnapping—and because the verdict was not tested by an interrogatory to show what predicate offense or offenses were found beyond a reasonable doubt, it is conceivable that the jury determined Adams to be guilty of committing the offense of aggravated murder while committing, attempting to commit, or fleeing immediately after committing or attempting to commit *only aggravated burglary*. It is mere speculation that the jury found that any of the other three felonies that would have been an element of the aggravated-murder charge and the capital specification was proved. For this reason, I believe that the case must be remanded for a new trial rather than merely a new sentencing hearing.

{¶ 160} We have held that a defendant's right to a unanimous verdict does not include a right to a unanimous theory of culpable conduct supporting that verdict. *See State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 65; *see also State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 53-54. These cases provide that jurors in a capital case "need not agree on a single means for committing an offense" and that there is no general requirement that the jury agree on preliminary factual issues underlying the verdict. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 188.

{¶ 161} The foregoing cases were decided relying on reasoning stated in the plurality opinion in *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). But they do not satisfactorily discuss the line of recent cases beginning with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and culminating in *Alleyne v. United States*, 570 U.S. ___, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). The majority cites a footnote in a federal habeas case reviewing convictions obtained under Oklahoma law, *Spears v. Mullin*, 343 F.3d 1215, 1236 (10th Cir.2003), fn. 20, along with a noncapital case from Nevada, *Crawford v. State*, 121 Nev. 744, 750, 121 P.3d 582 (2005), to say that *Apprendi* principles do not apply. But I believe that upholding this defective verdict would amount to approving "judicial factfinding that increases the mandatory minimum sentence for a crime" and would violate the Sixth Amendment. *Alleyne* at 2155. On resentencing, the sentencing judge would be asked to supply a fact (the existence of a specific predicate offense) when the jury did not specifically make that finding in its verdict form. I have previously noted that

> *Alleyne* follows a line of Sixth Amendment cases that recognizes the jury's right and obligations as fact-finder. The jury must find all elements of a crime beyond a reasonable doubt. *Id.* at 2156. A judge cannot impose a sentence that relies on facts not reflected in the jury's verdict. *Apprendi v. New Jersey*, 530 U.S. 466, 483, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000); *Blakely v. Washington*, 542 U.S. 296, 304, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004).

*State v. Willan*, ___ Ohio St.3d ___, 2015-Ohio-1475, __ N.E.3d ___, ¶ 39 (Lanzinger, J., dissenting). We must be especially mindful of these principles in a

capital case, in which the penalty of death—the ultimate penalty enhancer—is a possibility.

{¶ 162} Furthermore, given the further developments arising from the *Apprendi* line of cases, I decline to join in Justice O'Donnell's analysis of the issues presented in this case, because both *Griffin v. United States*, 502 U.S. 46, 48, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991) (in which the court declined to address whether a Sixth Amendment violation had occurred), and *Sochor v. Florida*, 504 U.S. 527, 538, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) (in which the court rejected an argument that the jury's improper consideration of a sentencing factor violated the Eighth Amendment), predated *Apprendi* and did not address a defendant's rights under the Sixth Amendment.

{¶ 163} Because *Apprendi* prevents Adams from being sentenced upon facts not reflected in the jury's verdict, he cannot be sentenced based upon the jury's flawed verdict form. And the wording of the jury's verdict in this case prevents us from concluding that the jury found all elements of the crime of aggravated murder beyond a reasonable doubt.

{¶ 164} The majority concludes, and I agree, that insufficient evidence was presented to establish that Adams committed aggravated burglary, one of the alternative elements supporting the capital specification and the charge of aggravated murder. Because the verdict form is worded in the disjunctive rather than the conjunctive, it is possible that the jury's verdict rested on an erroneous finding that Adams committed aggravated burglary as the element supporting the specification and the aggravated-murder charge. We cannot uphold Adams's guilty verdict when the jury did not make the required findings, and the ambiguity of the jury's verdict accordingly precludes us from affirming something that the jury may not have even decided.

{¶ 165} I disagree with the majority's holdings that sufficient evidence was presented to permit the jury to find that Adams committed rape, kidnapping,

and aggravated robbery. The majority's conclusions in this regard miss the key point, which is that we do not and cannot know what the jury unanimously found beyond a reasonable doubt—the verdict is not clear. I accordingly dissent from the majority's affirmance of the aggravated-murder conviction and would hold that this case must be remanded for a new trial.

_____

Paul J. Gains, Mahoning County Prosecuting Attorney, and Ralph M. Rivera and Martin P. Desmond, Assistant Prosecuting Attorneys, for appellee.

John B. Juhasz; and Maro & Schoenike Co. and Lynn A. Maro, for appellant.

_____